UNITED STATES of America, Plaintiff–Appellee,

v.

David W. DUERSON, Defendant–Appellant.

No. 93–2331.

United States Court of Appeals, Sixth Circuit.

Argued April 21, 1994.

Decided June 3, 1994.

Jeffrey E. Theodore, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Grand Rapids, MI, for plaintiff-appellee.

J. Terrance Dillon (argued and briefed), Dykema, Gossett, Spencer, Goodnow & Trigg, Grand Rapids, MI, for defendant-appellant.

Before: MERRITT, Chief Judge; and KENNEDY and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Armed with a loaded sawed-off shotgun and a container of Mace, defendant David Duerson, a managerial employee of the United Parcel Service, committed a robbery in which he took more than $185,000 from a UPS dispatcher and a courier employed by Federal Armored Services, Inc., an armored truck service. Mr. Duerson subsequently pleaded guilty to having violated 18 U.S.C. § 1951, which prohibits obstruction of commerce by robbery, and 18 U.S.C. § 924(c), which prohibits use of a firearm during and in relation to a crime of violence. He received a 37–month sentence for the robbery offense and a statutorily mandated consecutive ten-year sentence for the firearm offense.

Mr. Duerson contends on appeal (1) that the robbery represented a single act of aberrant behavior that ought to have entitled him to consideration for a downward departure from the sentencing range prescribed in the United States Sentencing Commission's *Guidelines Manual;* (2) that the offense lev-

el assigned to him under the sentencing guidelines ought not to have been increased, as it was under U.S.S.G. § 3B1.3, for abuse of a position of trust or use of a special skill; and (3) that the mandatory ten-year sentence for the firearm offense, coupled with the 37–month sentence for the robbery offense, violated the constitutional prohibition against cruel and unusual punishment.

The defendant was not entitled to a downward departure as of right. Regardless of whether it would have been within the sentencing judge's discretion to grant a downward departure here, the judge made it clear that he was not disposed to impose a sentence below the guideline range. Accordingly, and because we do not find the remaining assignments of error persuasive, we shall affirm the sentence.

I

Mr. Duerson, who was 37 years old at the time of the robbery, had been employed by UPS for most of his adult life. He had worked his way up to the position of industrial engineering manager and was earning a six-figure salary. A married man with three children, he was estranged from his wife and was in the process of getting a divorce. Child support payments and other obligations had left him short of cash, and he had recently written six insufficient-funds checks totaling more than $11,000. He expected that the robbery would yield $200,000. On the night before he committed the crime, he and a girlfriend talked of traveling to Las Vegas in a few days for a long weekend. (It does not appear the girlfriend was involved in the crime or knew that Mr. Duerson was planning it.)

The robbery took place shortly after 8:00 a.m. on Saturday, March 20, 1993, in a room that housed the vault at a UPS distribution center located on a large tract of land in Wyoming, Michigan. Mr. Duerson entered the room wearing a clear plastic mask and carrying both a container of chemical spray and a loaded 12–gauge shotgun with a barrel approximately 13 inches in length. Mr. Duerson released chemical spray on the two occupants of the room, told them not to move, and made off with two canvas bags containing a total of $186,185.05 in cash. One of the victims tried to call the authorities when Mr. Duerson left, but found that the telephone was dead; Mr. Duerson had cut the telephone wires ahead of time.

Mr. Duerson fled the scene in one of the all-terrain vehicles that UPS kept at the facility for traversing rough ground. His shotgun accidently fell out of the vehicle during the escape. Mr. Duerson drove on, but soon abandoned the all-terrain vehicle for a UPS delivery van that he had parked nearby. After driving the van to a parking lot where he had left a car rented several days before the robbery, Duerson transferred the bags of money to the rental car and drove off in it. He took an airplane to Wisconsin later in the day and secreted part of the stolen money there. Most of the rest was hidden in the trunk of his girlfriend's Mercedes automobile.

The police were able to trace the shotgun to Mr. Duerson's father, and this soon led to the defendant's arrest. All but about $9,000 of the stolen funds was ultimately recovered.

It is undisputed that defendant Duerson had been thinking about the robbery for some weeks before he committed it. As early as February 26, 1993, he was asking questions about the wiring of the telephone system at the Wyoming facility. He initially cut the telephone wires on March 17, planning to commit a robbery that day, but changed his mind for some reason. He cut the wires a second time before accosting the two men at the vault on March 20.

Several weeks before the robbery Mr. Duerson began taking UPS personnel for walks through the Wyoming facility, making it his business to tour the vault room with them. He also inquired, a few weeks before the robbery, about how to operate an all-terrain vehicle. During the same time frame he asked a co-worker where he could buy Mace, saying that he wanted it for the protection of his girlfriend. He also questioned lower level employees about the schedule followed by the courier service in making pickups of cash. (The money taken on March 20 was to have been stored by the courier service over the weekend prior to

delivery to a bank on Monday morning, March 22.) Finally, Mr. Duerson personally cut off the barrel of the shotgun shortly before the robbery.

Criminal proceedings were instituted against Mr. Duerson soon after his arrest, and the United States Attorney for the Western District of Michigan filed a four-count information against him in May of 1993. On July 13, pursuant to a plea agreement, Mr. Duerson pleaded guilty to the first two counts of the information. Counts three and four, which charged unlawful transportation of stolen currency and possession of an unregistered short-barreled shotgun, were ultimately dismissed.

Prior to the defendant's sentencing hearing, which was held on September 28, 1993, a probation officer conducted an extensive presentence investigation and prepared a lengthy report for the court. The probation officer recommended assigning Mr. Duerson an adjusted guideline offense level of 21 for the robbery offense. This reflected a three-level decrease in the base offense level for acceptance of responsibility and a two level increase, pursuant to U.S.S.G. § 3B1.3, for abusing a position of trust. The probation officer expressed himself as follows on the latter issue:

"In his capacity as an upper management employee of United Parcel Service, defendant was able to accumulate a vast array of knowledge regarding the inner-workings of the UPS system without any second guessing [by lower-level employees]. Defendant was able to peruse various departments within the UPS facility at will. This was in contrast to lower level employees who are restricted to a specific duty area per company policy. Defendant's position also allowed him to inquire of lower level employees, questions which were sensitive in nature, including those which pertained to the Federal Armored Courier schedule which were totally outside Mr. Duerson's area of official responsibility." [1]

Mr. Duerson had no prior criminal record, which meant that the guidelines placed him in Criminal History Category I. The guideline sentencing range for a person in this category with an adjusted offense level of 21 is imprisonment for 37–46 months. The probation officer noted that the sentencing court might wish to consider departing to a level below 37 months because of the fact that 18 U.S.C. § 924(c)(1) mandates a consecutive ten-year sentence for using a short-barreled shotgun. The defendant gave the court a sentencing memorandum urging a downward departure on the ground that "the conduct giving rise to this offense constituted a single act of 'aberrant behavior' by the defendant."

The court rejected the legal argument on which the defendant's request for a departure was based, and the court went on to express the view that the mandatory ten-year sentence and a sentence within the guideline range for the robbery "are fair in this particular case...." The court accepted a recommendation by the U.S. Attorney's office that Mr. Duerson be sentenced for the

---

1. The defendant objected to the two-level enhancement, and the probation officer responded as follows:

"In reviewing a number of debriefing statements made by Mr. Duerson's former UPS colleagues and subordinates, they identify him as an individual who: (1) had access to keys to operate vehicles used in the getaway; (2) made regular trips to the UPS deposit vault; (3) reviewed the telephone wiring system on several occasions; and, (4) asked a UPS truck manager about the possibility of changing the Federal Armored courier's schedule. In the words of one witness, defendant's latter line of inquiry regarding schedules 'was totally outside his (defendant's) area of official responsibility.' ... It is not unreasonable to believe that Mr. Duerson's position within UPS and the job title accompanying that position, prevented subordinates from second-guessing him and/or reporting unwarranted questions to the subordinates' immediate supervisor. In this aspect, lower level employees may have omitted this information fearing job loss or retribution. The presentence writer concedes that each calculated act mentioned earlier does not appear compelling in and of itself, but taken as a whole, provided Mr. Duerson with the necessary informational ingredients to plan a highly organized robbery.

"Additionally, as the defendant admits, UPS management runs a 'tight ship', a strict adherence to rules and regulations. General laborers such as loaders, sorters and the like are generally required to stay within a specific work station or area. In contrast, Mr. Duerson's position allowed him to roam the UPS facility at will while gaining access to areas which were off-limits to lower level employees."

robbery offense at the bottom of the guideline range.[2]

## II

Under 18 U.S.C. § 3553(b), a district court must impose a sentence within the guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." The sentencing commission has acknowledged that "[t]he controlling decision as to whether and to what extent departure is warranted can only be made by the courts," see U.S.S.G. § 5K2.0, and such decisions must be made in the first instance by district courts. Congress has directed courts of appeals to "give due deference to the district court's application of the guidelines to the facts," and a district court's findings of fact must be accepted by the court of appeals unless clearly erroneous. 18 U.S.C. § 3742(e).

The introductory chapter of the *Guidelines Manual* contains a section on "Probation and Split Sentences" that tells how the guidelines work with respect to a first offender who commits an "economic" crime of a sort that would often have resulted in nothing more than a sentence of probation under pre-guidelines practice. See U.S.S.G. Ch. 1, Pt. A, Intro. 4(d). After explaining that it considers at least a short period of imprisonment appropriate at offense levels as low as 11 and 12, the Commission says that "of course, [the Commission] has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures." *Id.*

■ Other courts have surmised from this that "single acts of aberrant behavior" were excluded from consideration in the formulation of the guidelines generally; and thus might justify sentences below the guideline range even in cases where probation is not a viable option. See, *e.g., United States*

*v. Fairless,* 975 F.2d 664, 668 (9th Cir.1992) (observing that nothing in the caselaw suggests that a single act of aberrant behavior can justify a departure only where the resulting sentence is probation); *United States v. Carey,* 895 F.2d 318, 324 (7th Cir.1990) ("the Guidelines permit a sentencing court to depart from the applicable range where it finds such [aberrant] behavior since the circumstance has not been adequately considered by the Commission"). See also *United States v. Andruska,* 964 F.2d 640, 644–45 (7th Cir.1992), where, in reversing a reduced prison sentence, the court of appeals said that "the Commission intended [at most] a limited application of the [aberrant behavior] principle." Whether or not the Commission intended only a limited application of the principle, we have no reason to doubt that a district court can give a first offender a prison sentence below the guideline range, as opposed to giving him probation, where the facts justify a finding that his crime truly was a single act of aberrant behavior.

The *locus classicus* of such an act may be found in *United States v. Russell,* 870 F.2d 18 (1st Cir.1989), where the driver of a Wells Fargo armored truck spontaneously yielded to temptation and kept an extra bag of money that had been delivered to the truck by mistake. In asking the district court for clarification of a sentence within the guideline range, the court of appeals accepted the proposition that an unplanned, opportunistic crime of this sort could justify a sentence below the guideline range. (The district court responded that it did not choose to exercise its discretion to depart downward, and the court of appeals ultimately affirmed the sentence. *Id.* at 21.)

At the opposite end of the spectrum from *Russell* is *Carey,* where the president of a trucking company—who also happened to be the pastor of a church—had engaged in a check-kiting scheme that required his constant attention and involved hundreds of overt acts over a period of 15 months. The Court of Appeals for the Seventh Circuit held that the conduct in question failed the "single

---

2. Mr. Duerson indicated a desire to serve his sentence in the Wisconsin area, where his children were located, and the court agreed to recommend such a placement to the Bureau of Prisons.

act" test; because the defendant's actions "were apparently the result of extensive planning and were spread out over a fifteen-month period," the defendant's behavior could not qualify as a single act of aberrant behavior. 895 F.2d at 325. The court observed that "[a] single act of aberrant behavior ... generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning because an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable." *Id.* (The court also noted that aberrant behavior "must be more than merely something 'out of character' or the defendant's first offense." *Id.*)

There is some difference of opinion among the circuits as to the proper classification of conduct falling between the factual extremes represented by *Russell* and *Carey*. In *United States v. Takai,* 941 F.2d 738 (9th Cir. 1991), members of an immigrant community had participated—out of altruistic motives—in a short-lived scheme to bribe an immigration official so that three other members of the community could obtain green cards. The district court determined that the defendants' conduct constituted single acts of aberrant behavior warranting downward departures. On appeal by the government, the Court of Appeals for the Ninth Circuit concluded that the fact that the bribe was not for profit could be considered in determining whether the behavior was aberrant. The court also concluded that little or no stress should be laid on the phrase "single act." Accordingly, and because it considered the conduct of at least one of the defendants to be "irrational," the court of appeals held that the district court had not abused its discretion in granting the departures.

The Court of Appeals for the Fourth Circuit, in an opinion written by the Chairman of the Sentencing Commission, has declared that "[w]e do not agree with the approach of the Ninth Circuit that a series of actions calculated to further criminal misconduct can be classified as aberrant behavior." *United States v. Glick,* 946 F.2d 335, 338–39 n. (4th Cir.1991). The *Glick* case involved five sepa-

rate disclosures of confidential business information over a period of 10 weeks. "Because of the extensive planning, number of actions involved, and length of time over which Glick planned and perpetrated his offense," the Fourth Circuit held, "his actions do not constitute a single act of aberrant behavior." *Id.* at 338. In this connection the court endorsed the proposition that a single act of aberrant behavior suggests, in the words of the *Carey* court, "a spontaneous and seemingly thoughtless act...." *Id.*

The Court of Appeals for the Seventh Circuit has likewise expressed disagreement with *Takai:* "we find that the Ninth Circuit's approach offers too broad an interpretation of the aberrant behavior rationale." *Andruska,* 964 F.2d at 645. The defendant in *Andruska* was a woman who had concealed a fugitive from arrest on several different occasions over a period of some months. It was an abuse of discretion, the court of appeals held, to grant a downward departure under those circumstances.

The Ninth Circuit adhered to *Takai* in *Fairless,* a case that bears some similarity to this one on its facts. The defendant in *Fairless,* a man who suffered from manic depression, robbed a bank while wearing a mask and brandishing a gun. Working in favor of the *Fairless* defendant was the fact that the crime was more nearly spontaneous than that of the defendants in *Takai*—"[i]t required less planning, occurred within a shorter time frame, and consisted more literally of a 'single act'...." 975 F.2d at 667. Also working in the defendant's favor was the fact that the gun was unloaded, a circumstance which the court took to mean that the defendant was "suicidal." *Id.* at 668. The guideline range in *Fairless* was imprisonment for 51–63 months, and the district court, departing downward on an aberrant behavior theory, imposed a sentence of 30 months. The court of appeals upheld the sentence as "reasonable and not an abuse of discretion." *Id.* at 669.

In the case at bar the district court expressed agreement with the rationale employed by the Seventh Circuit in *Carey.* Under that rationale, the district court decided, defendant Duerson's conduct could not prop-

erly be classified as a single act of aberrant behavior. The crime was obviously the product of extensive planning and thus, as the court said, could not have been "a spontaneous and seemingly thoughtless act. . . ." The district court went on to observe that "[w]e had some rather sophisticated actions that went over a period of days and even weeks here, apparently, that belie an unplanned and spontaneous and unexpected act. . . ."

The district court was not impressed by defendant Duerson's argument that he had previously led an exemplary life, came from a good family, had a good education and a promising future at UPS, and did not have a history of violence or any other sort of erratic behavior. "[T]he question of whether or not the criminal act is [aberrant] in the context of an individual's overall life," said the court, "I think is adequately covered in the sentence guidelines when it comes to the criminal history level, and when it comes to the range in the Sentence Guideline Act where the Court has the ability to go to the bottom of the range where the act is seemingly out of character with the rest of the person's life."

The district court might also have mentioned that the Sentencing Commission has been charged by Congress with the responsibility of assuring that the guidelines are "entirely neutral" as to an offender's "socioeconomic status." 28 U.S.C. § 994(d). The Sentencing Commission has determined, moreover, that age, education, mental and emotional condition, and family and community ties are factors "not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," U.S.S.G. §§ 5H1.1, 5H1.2, and 5H1.6, a viewpoint one member of this panel has previously questioned. See United States v. Brewer, 899 F.2d 503, 511 (6th Cir.) (Merritt, C.J., dissenting), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). It is only natural that judges whose own backgrounds are likely to bear a closer resemblance to the background of the unusual defendant like Mr. Duerson than to the backgrounds of most criminal defendants should feel sympathy for someone like Mr. Duerson, whose crime would undoubtedly seem aberrational

in light of his life history. Whether we like it or not, however, this court has accepted the argument that a major purpose of the guidelines was to eliminate such considerations from the sentencing process. See generally United States v. Davern, 970 F.2d 1490, 1496–97 (6th Cir.1992) (Nelson, J., concurring), cert. denied, —— U.S. ——, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993).

As to the "single act" question, the issue is an open one in this circuit, and we are content to let it remain so for a while longer. We need not decide whether the extensive planning that went into the armed robbery committed by Mr. Duerson would have precluded a finding that he was guilty of nothing more than a single act of aberrant behavior, because the judge made it quite plain that he simply had no interest in departing downward.

The judge took note of the criticism that has been leveled against guideline sentencing and statutorily mandated sentences on the grounds that they can produce unjust results. In this particular case, however, the judge expressly found that the result was fair. He analyzed the sentence in terms of three important functions—punishment, deterrence, and an opportunity for rehabilitation—and found that the sentence served all three goals.

Displaying a mindset rather different from that of the sentencing judge in Fairless, this judge dismissed as "psychobabble" the views of a professional psychologist who had submitted a report opining that Mr. Duerson (1) suffered from extreme stress and a loss of self esteem as a result of having been separated from his wife and children, (2) was a victim of "negative, uncaring, vindictive, and hostile aspects of UPS management," and (3), although "psychologically competent and . . . not legally insane," had "committed an act that was strikingly out of character, giving no thought to the consequences or the long term outcome of his behavior."

What was of paramount importance to the district judge here was the seriousness of the offense rather than defendant's motivation, mental state, character or previous life history. "One of the worst crimes was committed," he observed, and he asked Mr. Duerson

to think about "what it must have been like for that Federal Armored man who stared into the barrel of a sawed-off shotgun that incidently was loaded, and who was maced, and who was in the macing process temporarily placed out of commission...."

Under 18 U.S.C. § 3553(a)(2), a sentencing court must consider, among other things, the need for the sentence

"(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [and]

(B) to afford adequate deterrence to criminal conduct...."

The district judge carefully considered these matters, among others, and determined that fairness required punishment within the prescribed guideline range. The judge would not have granted a downward departure even if he had thought he had the power to do so, and this makes it unnecessary for us to decide whether a departure would have been permissible under the particular circumstances of this case.

### III

█ U.S.S.G. § 3B1.3 requires a two-level increase in a defendant's base offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense...." As we have seen (n. 1, *supra*), the probation officer who wrote the presentence report concluded that Mr. Duerson had abused his position of trust at UPS in order to obtain information needed to plan a highly organized robbery.

The district court agreed. In this connection the court cited the defendant's exploitation of his position as a manager by (1) cutting through the security restrictions applicable to lower-level employees so that he could learn where everything was located, including the deposit vault; (2) taking advantage of his access to the keys to the two UPS vehicles used in the getaway; (3) reviewing the telephone system so that he could disable it; and (4) questioning a UPS truck manager about the Federal Armored courier's schedule. It would have been far more difficult

for the defendant to commit the crime and make good his escape, the court found, if he had not held a position of trust or had not possessed special skills in computers and electronics. Noting that the increase in the offense level was not an enormous one, the court held it proper to make the two-level adjustment.

Application Note 1 in the Sentencing Commission's Commentary on U.S.S.G. § 3B1.3 says that "[t]he position of trust must have contributed in some *substantial* way to facilitating the crime" (emphasis supplied), and the defendant argues that his position with UPS had "little if any significance" as far as his ability to commit the crime was concerned. The district court found otherwise, however, and we are permitted to set such a finding aside only if we determine that it was clearly erroneous. 18 U.S.C. § 3742(e). We see no basis for making such a determination here.

Section 3B1.3 was not intended to apply to every case in which the defendant held a position of trust bearing "some remote connection with the defendant's crime." *United States v. Moored*, 997 F.2d 139, 145 (6th Cir.1993). We held in *Moored* that a defendant's offense level could not be increased for abuse of a position of trust unless the person or entity with which the defendant held such a position was a victim or intended victim of the offense. *Id.* Asking us to find that the risk of loss of the funds in question here had shifted from UPS to Federal Armored Services by the time of the robbery, defendant Duerson argues that the only victim of his crime was Federal Armored, a company as to which he did not stand in a position of trust.

This argument was not presented to the district court, and it has therefore been waived. This court has no way of knowing whether it was UPS or Federal Armored that would ultimately have had to bear the loss if the funds had not been recovered; that is a question of fact which should have been presented to the district court for resolution.

Even if the risk-of-loss question had been raised in the district court and resolved in favor of the defendant, we would have found

it difficult to say that UPS was not a victim of the crime. One of the men assaulted and maced by the defendant was a UPS employee. The privacy of the UPS vault was violated by the robbery. It was UPS phonelines that were cut by the defendant. It was UPS vehicles that he commandeered for his escape. And it was a UPS bank account into which the funds were supposed to have been deposited on Monday morning. Assuming that UPS would have had a meritorious claim against Federal Armored for failure to make the deposit on time, it does not seem to us that the existence of such a chose in action could mean that UPS was not a victim.

At the very least, we have it on the authority of the psychologist hired by Mr. Duerson's lawyer that UPS was an *intended* victim.[3] If the defendant held a position of trust with an intended victim, that is enough to satisfy *Moored.*

## IV

██ Mr. Duerson's final argument is that the imposition of a total sentence of 157 months for crimes that entailed assaulting two men with a loaded sawed-off shotgun, spraying them with Mace, and relieving them of more than $185,000 in cash constituted cruel and unusual punishment. The argument has no merit.

Loaded guns do sometimes go off during hostile confrontations, accidently or otherwise, and short-barreled shotguns are particularly dangerous because of the wide pattern in which the pellets are distributed. Congress has decided that a person convicted of using or carrying an ordinary firearm during and in relation to a crime of violence or drug trafficking offense must be sentenced to a five-year term of imprisonment, but must be sentenced to a ten-year term if the weapon is a short-barreled shotgun. 18 U.S.C. § 924(c)(1). Defendant Duerson does not challenge the rationality of this distinction. He contends, rather, that the 157–month sentence resulting from the linkage of the ten-year term for the firearm offense and the 37–

month term for the robbery offense was "grossly disproportionate" to his crimes. In this connection he cites *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

In *Harmelin* the Supreme Court upheld the constitutionality of a mandatory life sentence without possibility of parole for possession of more than 650 grams of cocaine. If a life sentence was not grossly disproportionate to that crime, we do not believe that a 157–month sentence is grossly disproportionate to defendant Duerson's crimes. We are strengthened in this conclusion by *United States v. Elder,* Nos. 91–5605/5606, 1992 WL 42346 (6th Cir. March 3, 1992) (unpublished), *cert. denied,* — U.S. ——, 112 S.Ct. 2320, 119 L.Ed.2d 239 (1992) where we concluded that *Harmelin* did not invalidate a consecutive 30–year sentence mandated by 18 U.S.C. § 924(c)(1) for using or carrying a machine gun during and in relation to a crime of violence or drug trafficking offense. See also *United States v. Dumas,* 934 F.2d 1387, 1389 (6th Cir.) (upholding the consecutive five-year sentence mandated by § 924(c) for using or carrying an ordinary firearm), *cert. denied,* 500 U.S. 925, 111 S.Ct. 2034, 114 L.Ed.2d 119 (1991). *Cf. Hutto v. Davis,* 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (upholding a 40–year sentence for possession of approximately nine ounces of marijuana). Congress contemplated that the penalties for the two crimes of which Mr. Duerson was convicted could reach a total of 360 months, and we are not prepared to say that a total of 157 months is either cruel or unusual.

**AFFIRMED.**

---

**3.** "[A]lthough [Duerson] is not an angry man," the psychologist reported, "he became very angry at UPS management, until he could only think of lashing back at them. Taking money from [UPS] hurt them because of their extreme emphasis on profitability, and also provided Mr. Duerson with some compensation for the extreme hardship he felt."