61 F.3d 904
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Naomi DELGADO, Defendant-Appellant.
 No. 94-3714.
 United States Court of Appeals, Sixth Circuit.
 July 14, 1995.
 
 Before: CONTIE, MILBURN, and SILER, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Defendant Naomi Delgado appeals the sentence imposed by the district court following her guilty plea to charges of corruptly endeavoring to influence a trial juror in violation of 18 U.S.C. Sec. 1503 and corruptly tampering with grand jury witnesses in violation of 18 U.S.C. Sec. 1512(b)(1). On appeal, the issues are (1) whether the district court erred by failing to apply a downward adjustment pursuant to United States Sentencing Guidelines ("U.S.S.G.") Sec. 3B1.2 for defendant's alleged minor role in the crimes of which she was convicted; (2) whether the district court erred in finding that defendant did not enter into a plea agreement with the government and in failing to apply a downward departure pursuant to U.S.S.G. Sec. 5K1.1 for defendant's cooperation with the government; (3) whether the district court erred by failing to find that the government acted in bad faith when it refused to file a Sec. 5K1.1 motion, which defendant claims the government agreed to do in pre-plea negotiations; and (4) whether the district court erred in finding that it lacked discretion to depart from the applicable guideline range even though defendant's offense severity allegedly overstated her involvement in the offenses of which she was convicted. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 In 1989, defendant Naomi Delgado's former husband, Reuben Sturman, was convicted on charges of conspiracy, tax evasion, and obstruction of justice in connection with his international pornography business. See United States v. Sturman, 951 F.2d 1466 (6th Cir.1991) (affirming defendant's conviction), cert. denied, 112 S.Ct. 2964 (1992). In November 1989, near the end of Sturman's trial, defendant agreed with Sturman that she would approach one of the jurors, Greg Hofstetter, and urge him to vote to acquit Sturman. Defendant was observed in court staring at Hofstetter and winking at him. During a recess at the trial, defendant sent Hofstetter a note, bearing a lipstick imprint, that invited him to join "another person" at a suburban restaurant that evening. Hofstetter went to the restaurant in hopes that the note had come from the "sexy looking woman" in court. J.A. 128. He and defendant had dinner that evening. During the meal, defendant mentioned that she was with the Sturman party, but she did not say that she was Sturman's wife. Hofstetter stated that defendant repeatedly mentioned the trial and insisted that Hofstetter vote for Sturman's acquittal. After dinner, while Sturman's bodyguard drove the two home, defendant made physical advances to Hofstetter, which Hofstetter stated he rejected. Thereafter, defendant began to call Hofstetter's home, although she spoke with Hofstetter only once. During that conversation, defendant inquired as to the course of jury deliberations and again attempted to persuade Hofstetter to push for an acquittal.
 
 
 3
 Hofstetter failed to inform the court or any of the other jurors about the contact with defendant. The jury subsequently voted to convict Sturman. This scheme remained secret until a secretary employed by defendant and Sturman informed the government in June 1992.
 
 
 4
 Sturman was sent to prison in Boron, California, but he escaped on December 7, 1992. In January 1993, the government conducted interviews with Stephanie Friedman, Sturman's former secretary; Douglas "Kelly" Friedman, the driver of Sturman's getaway car; and Sylvia Richards, then Sturman's secretary. The three were also served subpoenas requiring them to testify before a federal grand jury in Ohio. Sturman and defendant warned the witnesses not to tell the grand jury about their knowledge of Sturman's escape from prison, his whereabouts, or defendant's role in Sturman's escape and continuing evasion of the law.
 
 B.
 
 5
 Defendant was originally arrested on February 19, 1993, and immediately entered negotiations for a plea agreement with the government. On February 20, 1993, she indicated that she wanted to cooperate with the government, and on February 24, 1993, she signed a proffer letter containing assurances that her statements would not be used against her in a criminal case but granting her no other immunity.
 
 
 6
 Defendant was briefed on her proffer letter in Cleveland, Ohio, on February 24 and 25, 1993. During these briefing sessions, defendant's attorney, Roger M. Olsen, requested full immunity for defendant. However, the government attorneys informed Olsen that defendant would have to plead guilty to at least a jury tampering offense. Moreover, the government attorneys said that they were not satisfied, on the basis of the initial proffer, that defendant was being truthful. Olsen informed the government attorneys that defendant was unwilling to agree to any jail time and requested that the matter be left open without any agreement.
 
 
 7
 In a telephone conversation with Sturman on February 25, 1994, the last day of her first proffer session, defendant indicated that she was not fully cooperating with the government. Defendant told Sturman that "they [the government] know a lot more than we think they know," and said: "But they like, when I wouldn't, I'd only give them certain information and then they would come out and say 'Well, what about this meeting?' So they knew. I must have told Stephanie [Friedman] or something must have happened.... She has spilled the beans." J.A. 47. Defendant also indicated that she would not plead guilty to even one charge, as the government had insisted. "Why, you know I just said to [my attorney], 'I don't want that.' " J.A. 47.
 
 
 8
 Defendant testified in an unrelated case against Sturman on March 11, 1993, in Chicago, Illinois. A plea meeting was subsequently held at the United States Attorney's Office in Chicago, on March 12, 1993. Present at the meeting were Olsen; his investigator, Ronald Saranow; Assistant U.S. Attorney Craig Morford; and a Justice Department trial attorney, Michael Attanasio. In an affidavit, Olsen stated that the government attorneys at the meeting advised him that they wanted defendant to plead guilty to one count of obstruction of justice in exchange for the government's recommendation that she serve no jail time if she cooperated with them. Olsen stated that he rejected this offer but that the government attorneys informed him that the offer was a firm one. Olsen requested assurances from the government that a deferral of defendant's plea would not result in a disposition of the case that was less favorable to defendant than the offer the government had just presented. According to Olsen, the government attorneys agreed that it would not. However, Attanasio in his affidavit claimed that the government attorneys stressed to defendant that truthfulness was a prerequisite to any plea agreement and that they repeatedly emphasized that any agreement would have to include a guilty plea to at least one charge. Furthermore, Attanasio stated that the prosecutors "did not agree to hold open the one count plea offer for [defendant's] perpetual and unilateral consideration, nor did [they] expressly rule out a potentially less favorable disposition for [defendant] at some later date." J.A. 63-64. As late as April 1993, defendant confirmed that no plea agreement had been reached with the government in a telephone conversation with Sturman during which she told him that the government would not decide what to do about a plea agreement with her until they were convinced that she was fully cooperating.
 
 
 9
 At a meeting held in Washington, D.C., on April 9, 1993, the government notified defendant that it intended to move forward with its investigation into the case. The investigation subsequently revealed that defendant had a high level of culpability in the witness and jury tampering incidents, that she was lying about the extent of her knowledge and involvement with the schemes, and that she had discussed transferring Sturman's assets into her name in order to circumvent certain federal tax liens. Consequently, the government decided to limit any plea agreement with defendant to a guideline departure tied to the extent of her cooperation.
 
 
 10
 Attanasio transmitted a draft plea agreement to Olsen on August 18, 1993. The agreement provided that defendant would plead guilty to two felony counts. The recommended sentence was to be within the guideline range, but the government was willing to move for up to a four-level reduction based on the extent of defendant's cooperation and a two-level reduction for defendant's acceptance of responsibility. Attanasio stated that he told Olsen that the change in the charges was the result of information discovered in the government's investigation. He denied that Olsen at any point claimed that the government had reneged on a prior agreement. Moreover, Attanasio stated that Olsen made specific objections to the substance of the draft agreement, indicating to the government attorneys that plea negotiations had resumed.
 
 
 11
 A federal grand jury returned a two-count indictment against Sturman and defendant on October 20, 1993. A superseding indictment was returned on November 18, 1993. Count one of the indictment charged defendant and Sturman with corruptly endeavoring to influence a federal juror in the discharge of his duty, on or around November 1, 1989 and November 17, 1989, in violation of 18 U.S.C. Sec. 1503. Count two of the indictment charged that on or around January 23, 1993, defendant and Sturman corruptly persuaded and attempted to influence the testimony of other persons in a federal grand jury proceeding at which those persons had been subpoenaed to testify, in violation of 18 U.S.C. Sec. 1512(b)(1).
 
 
 12
 On February 14, 1994, defendant filed a Motion to Compel Specific Performance of the Plea Agreement, alleging that the government had reached a plea agreement with defendant in March 1993 and had "subsequently unilaterally and vindictively breached that agreement to charge her with a single felony count with a government recommendation of no jail time by charging her in two felony counts without a recommendation of no jail time." Appellant's Motion to Compel Specific Performance at 2, quoted in Appellee's Brief at 4. The district court denied defendant's motion to compel specific performance on March 21, 1994, finding that "[i]t is clear that the United States and Delgado never reached [an] agreement" that would limit defendant's exposure to criminal liability. J.A. 91. Defendant entered an unconditional guilty plea to both counts of the superseding indictment on April 26, 1994. At the change of plea hearing, defendant stated that no promises had been made to her to induce her plea. On June 27, 1994, defendant was sentenced to 21 months imprisonment and two years of supervised release. This timely appeal followed.
 
 II.
 A.
 
 13
 Defendant argues that the district court erred in failing to apply a two level reduction in her base offense level, pursuant to Sec. 3B1.2(b), to account for her minor role in the offenses of which she was convicted. The government responds that defendant was not a minor participant in the offenses and that defendant did not meet her burden of proving by a preponderance of the evidence that she was entitled to a reduction pursuant to Sec. 3B1.2(b).
 
 
 14
 The Guidelines provide that a defendant's offense level may be decreased by two levels if the defendant was a minor participant in criminal activity. U.S.S.G. Sec. 3B1.2(b). However, the district court found in its memorandum and order dated June 27, 1994 that it was "precluded from reaching the issue of whether the evidence supports such an adjustment [pursuant to Sec. 3B1.2] ... because Sec. 2X3.1 [the section on which the district court relied in sentencing] incorporates an adjustment for reduced culpability in calculating the offense level." J.A. 185. See U.S.S.G. Sec. 2X3.1 commentary (application note 2) ("The adjustment from Sec. 3B1.2 ... normally would not apply...."). Thus, the district court indicated that it lacked any discretion to allow defendant the decrease in offense level authorized in Sec. 3B1.2(b), even though it felt this led to a "particularly harsh result, given that credible statements have been offered suggesting that [defendant] played only a minimal role in the plan to influence the petit juror." J.A. 185.
 
 
 15
 Ordinarily, we review a district court's decision as to whether to grant a defendant a role reduction only for clear error. United States v. Blandford, 33 F.3d 685, 710 (6th Cir.1994), cert. denied, No. 94-1295, 1995 WL 50674 (U.S. May 1, 1995); United States v. DeFranco, 30 F.3d 664, 669 (6th Cir.), cert. denied, 115 S.Ct. 349 (1994). However, because in this case defendant has alleged that the district court erred in its legal interpretation of the Guidelines, we will review de novo the district court's holding that it lacked discretion to consider the adjustment under Sec. 3B1.2(b). United States v. Garza, 999 F.2d 1048, 1051 (6th Cir.1993); 18 U.S.C. Sec. 3742(e)(2).[1] In addition, we recognize that it is the burden of defendant to establish her entitlement to a downward adjustment by a preponderance of the evidence. United States v. Moss, 9 F.3d 543, 554 (6th Cir.1993); United States v. White, 985 F.2d 271, 274 (6th Cir.1993).
 
 
 16
 Section 2X3.1 of the Guidelines, under which defendant was sentenced, allows a sentencing court to decrease a defendant's base offense level by six levels, so long as the resulting offense level is not less than four or more than 30. This section thus accounts for the reduced culpability of a defendant who is deemed an accessory after the fact. Consequently, the second application note following Sec. 2X3.1 provides: "The adjustment from Sec. 3B1.2 (Mitigating Role) normally would not apply because an adjustment for reduced culpability is incorporated in the base offense level." U.S.S.G. Sec. 2X3.1 commentary (application note 2). Defendant argues that the district court erred in failing to recognize that the inclusion of the word "normally" in the application notes gives the court discretion to apply both Sec. 3B1.2 and Sec. 2X3.1 under unusual circumstances. We agree with defendant. The word "normally" means "commonly, usually ... in normal circumstances ... under normal conditions...." Webster's Third New International Dictionary 1540 (unabridged ed. 1986). It is not an absolute bar. The district court, in finding that it was precluded from considering the applicability of Sec. 3B1.2, failed to recognize the narrow band of discretion created by the Sentencing Commission's inclusion of the word "normally" in the application notes.
 
 
 17
 However, we find that the district court's error in not recognizing its discretion to apply the Sec. 3B1.2 adjustment in exceptional circumstances is harmless because there are no exceptional circumstances justifying the district court's exercise of this discretion. The district court noted that "credible statements [had] been offered suggesting that [defendant] played only a minimal role in the plan to influence the petit juror." J.A. 185. However, under Sec. 3B1.2, defendant's role in the offense encompasses more than her role in planning the offense; it also includes her actions to effectuate the plan. The evidence demonstrates that defendant agreed to influence a juror during the trial of her former husband, Sturman. To that end, she winked and stared at the juror during the trial proceedings, invited the juror to dinner, made physical advances toward the juror, called the juror's home, and spoke with the juror on the telephone on at least one occasion. She used this contact to attempt to persuade the juror to vote for Sturman's acquittal and actively concealed the nature of her relationship to Sturman. This is significantly more culpability than Sec. 3B1.2(b) allows. "[A] minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. Sec. 3B1.2 commentary (application note 3). See DeFranco, 30 F.3d at 668-69 (upholding the denial of a minor participant reduction where the defendant played a "central" or "key" role in the offense even if the defendant was less culpable than others involved in the offense); United States v. Burroughs, 5 F.3d 192, 194-95 (6th Cir.1993) (same); United States v. Walker, 1 F.3d 423, 427-28 (6th Cir.1993) (same); United States v. Perry, 908 F.2d 56, 58 (6th Cir.) (same), cert. denied, 498 U.S. 1002 (1990).
 
 
 18
 "[Defendant's] small role could have been performed by anyone Sturman chose," Appellant's Reply Brief at 2, but the facts show that it was defendant who actually performed the acts in question. Although defendant's husband may have been the mastermind of the schemes in which defendant participated, as defendant claims, defendant's behavior indicates no resistance, nor any hesitation to perpetuate the fraud. Nothing in the record shows that defendant lacked knowledge of the schemes in which she was involved or that she failed to understand them. Furthermore, there are no allegations that defendant's complicity was the result of coercion or duress.
 
 B.
 
 19
 Defendant next argues that the district court erred in finding that she never entered into a plea or pre-plea agreement with the government and in failing to apply a downward departure pursuant to Sec. 5K1.1. Although defendant concedes that no written plea agreement was ever reached, she argues that her cooperation with the government was induced by the promise of the prosecutors that if she cooperated, the government would move for a downward departure under Sec. 5K1.1, which allows a sentencing court to depart from the Guidelines in recognition of a defendant's substantial assistance to the government. Furthermore, defendant asserts that she "acted in a manner in which only a person with a plea-bargained promise would act." Appellant's Reply Brief at 5. We review the district court's findings regarding the existence and terms of a plea agreement for clear error. United States v. Borders, 992 F.2d 563, 566-67 (5th Cir.1993); United States v. Helmandollar, 852 F.2d 498, 501 (9th Cir.1988); see United States v. Robison, 924 F.2d 612, 614 (6th Cir.1991).
 
 
 20
 In its order dated March 21, 1994, the district court found that "the United States and [defendant] did not enter into a plea agreement." J.A. 90. In reaching this conclusion, the district court pointed to evidence demonstrating that despite defendant's claim that she believed the government attorneys had offered her an open-ended plea bargain that included a promise to move for a substantial assistance departure in March 1993, defendant was aware that the government would not make a final decision regarding a plea agreement with her until it was convinced that she was fully cooperating. In addition, the district court found that although the United States had communicated a plea offer to defendant, she had rejected the offer and had extended a counteroffer, which the United States had subsequently rejected. Applying traditional rules of contract law, see United States v. Skidmore, 998 F.2d 372, 375 (6th Cir.1993) (stating that the court regards a plea agreement as a type of contract that is analyzed under general principles of contract law), the district court found that there had been no offer and acceptance and that no plea agreement had been reached.
 
 
 21
 There is ample support for the district court's decision in the record. The evidence demonstrates that defendant rejected plea offers from the government in both March and August 1993. Defendant repeatedly announced that she was not willing to plead guilty to a felony offense, a condition on which the government insisted. Moreover, defendant's telephone conversations with Sturman indicate her awareness that no plea agreement had been reached. In addition, the government informed defendant at the start of the plea negotiations that any plea agreement was dependent upon defendant's full and truthful cooperation; prosecutors then warned defendant on several occasions that they were not convinced she was being honest. Therefore, defendant knew that the government did not believe that the terms on which its promises were contingent had been met, or would be met absent a change in defendant's behavior.
 
 
 22
 Defendant argues that she "agreed to enter a plea of guilty in exchange for the government[']s promise to request a downward departure pursuant to [Sec.] 5K1.1." Appellant's Brief at 6. This is inconsistent with defendant's sworn testimony at the change of plea hearing, at which she told the district court that no promises had been made to her to induce her plea. Moreover, defendant's own brief states that defendant "attempted to negotiate a plea with the government, however, all attempts were unsuccessful," Appellant's Brief at 4, and that "appellant continued to cooperate believing what ever [sic] eventual agreement was reached, it would include a promise of a [Sec.] 5K1.1," Appellant's Brief at 9. These statements all indicate that defendant was aware that no agreement had been reached but that she cooperated to some degree in the hope that any agreement the parties entered into in the future would include a motion requesting a departure for substantial assistance.
 
 
 23
 Defendant argues that the government made a firm plea offer in March 1993, which apparently led her to believe that if she agreed to cooperate, the government would move for a downward departure at sentencing. She also asserts that after she refused to agree to the government's proposed plea agreement, her attorney received assurances that she would receive no "worse [a] disposition" than the agreement offered by the government at that time. J.A. 40. Although there is evidence that the government did make an offer to defendant, as she claims, Attanasio's affidavit flatly denies that the offer was firm in any sense other than the fact that it had been approved by the government attorneys' "superiors." Moreover, the record shows that the offer was clearly revoked five months later, in August 1993, when Attanasio transmitted to defendant's attorney a draft plea agreement containing different terms. Significantly, defendant's attorney made no mention at that time of having previously reached an agreement with the government. We note that the draft plea agreement submitted to defendant's attorney, which should have apprised defendant of the terms to which the government was willing to assent, included a provision explicitly requiring defendant's full cooperation as a condition of the government's obligation to move for a downward departure. The agreement also stated that "the level of downward departure, if any, which the United States recommends shall be determined by the government attorneys as a matter within the exercise of their sole discretion and judgment." J.A. 25. Finally, even assuming defendant's attorney received the assurances defendant claims, she is not entitled to enforce the terms of the original agreement. "A plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." Mabry v. Johnson, 467 U.S. 504, 507 (1984). Even if a defendant has timely accepted a proposed agreement and the prosecutor subsequently revokes the offer, there is no constitutional right to enforce the original plea agreement. Id. at 507. Thus, this is not a case, as defendant claims, where the government "got [defendant's] cooperation and a guilty plea while [defendant] got nothing." Appellant's Reply Brief at 6.[2]
 
 C.
 
 24
 Defendant also argues that the district court erred by failing to find that the government acted in bad faith when it refused to file a Sec. 5K1.1 motion for downward departure and by failing to compel the government to file such a motion. Defendant asserts that the government's refusal to move for a downward departure was "tantamount to bad faith," Appellant's Brief at 14-15, and was a coercive action intended to induce defendant's cooperation and acceptance of an open plea without obligating the government.
 
 
 25
 A district court's decision not to depart downward is subject to appellate review only if the court fails to recognize that it has discretion to depart in appropriate circumstances. United States v. Griffith, 17 F.3d 865, 882 (6th Cir.), cert. denied, 115 S.Ct. 149 (1994); United States v. Chalkias, 971 F.2d 1206, 1217 (6th Cir.) (per curiam), cert. denied, 113 S.Ct. 351 (1992). In this case, the district court correctly determined that it could not depart from the Guidelines. The departure defendant sought is governed by Sec. 5K1.1, which provides: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." The government did not file a Sec. 5K1.1 motion requesting a substantial assistance departure. Accordingly, in its sentencing memorandum and order, the district court found that it could not depart from the Guidelines based on defendant's assistance.
 
 
 26
 "[Section 5K1.1] gives the Government a power, not a duty, to file a motion when a defendant has substantially assisted." Wade v. United States, 504 U.S. 181, 112 S.Ct. 1840, 1843 (1992). Such a motion, however, is a legal prerequisite to a departure under Sec. 5K1.1. United States v. Levy, 904 F.2d 1026, 1035 (6th Cir.1990), cert. denied, 498 U.S. 1091 (1991). A sentencing court may review the government's decision not to file a Sec. 5K1.1 motion only if the refusal was based on an unconstitutional motive or if the government's motive in refusing to file the motion was not rationally related to any legitimate governmental end. Wade, 112 S.Ct. at 1843-44. Defendant has neither argued nor come forward with any evidence that the government's failure to file a substantial assistance motion was based on a constitutionally impermissible factor. Moreover, the government's decision not to file such a motion was a rational response to what it perceived to be defendant's failure to fully cooperate, despite the fact that all potential agreements had been conditioned on defendant's complete cooperation.
 
 
 27
 "[A] claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing. Nor would additional but generalized allegations of improper motive." A defendant has a right to a hearing only if he makes a substantial threshold showing of unconstitutional motive.
 
 
 28
 United States v. Bagnoli, 7 F.3d 90, 92 (6th Cir.1993) (citation omitted), cert. denied, 115 S.Ct. 95 (1994). Because defendant relied merely on her own allegations of assistance, the district court had no grounds on which to review the government's decision not to file a Sec. 5K1.1 motion. See also Sullivan v. United States, 11 F.3d 573, 575 (6th Cir.1993). "There is no precedent in case law for this court to assume from an empty record that the government's decision was prima facie evidence of their bad faith in the plea process." United States v. Johnson, 46 F.3d 19, 21 (6th Cir.1995) (per curiam).
 
 D.
 
 29
 Finally, defendant argues that the district court erred in failing to recognize its discretion to apply a downward departure because defendant's offense level overstated her involvement in the offenses at issue. Defendant asserts that the Guidelines grant sentencing courts a measure of discretion to depart from the applicable guideline range in order to impose individualized sentences in exceptional cases and that defendant's minimal participation in the offenses at issue makes her case one for which such a departure is appropriate. However, a district court's refusal to depart from the Guidelines is not cognizable on appeal if the district court properly computed the guideline range, imposed a sentence that was not illegal or did not amount to an incorrect application of the Guidelines, and was not unaware that it had discretion to depart from the applicable guideline range. United States v. Vincent, 20 F.3d 229, 239 (6th Cir.1994); Griffith, 17 F.3d at 882.
 
 
 30
 The charge of tampering with a juror is sentenced in accordance with Sec. 2J1.2, "Obstruction of Justice," which specifies a base offense level of 12. However, Sec. 2J1.2(c), the cross reference, provides that "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense, apply Sec. 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined [under Sec. 2J1.2(a) and (b) ]." The district court found that defendant's offenses involved obstruction of Sturman's initial prosecution; accordingly, it applied Sec. 2X3.1 pursuant to the cross reference. Under Sec. 2X3.1, defendant's base offense level was calculated as "6 levels lower than the base offense level for the underlying offense, but in no event less than 4, or more than 30." U.S.S.G. Sec. 2X3.1(a). The government calculated the offense level for the underlying offense, Sturman's tax evasion, as 22. Thus, defendant's base offense level was 16.[3]
 
 
 31
 During the sentencing hearing held on June 27, 1994, the district court judge, in discussing the cross reference, said:
 
 
 32
 I have a huge philosophical difference here with the United States sentencing guidelines in this case. I think it is just plain wrong to add points to [defendant's] sentence because of the amount of money that was involved in the Jury trial where she admittedly tried to help her husband by contacting one of the Jurors. It just seems philosophically totally wrong to say that if this had been a $500 case here then she wouldn't get all of those extra points.... I am inviting you to appeal this because I think ... I am bound by these guidelines, and I do not see how I can do anything other than follow this the way that these are set forth ... but I think this is totally wrong. I deplore the fact that the Courts do not have discretion to take some of these things into account.
 
 
 33
 Transcript of Sentencing Hearing at 6-7. Defendant pressed the district court to depart from the Guidelines, arguing that defendant's actions did not obstruct an investigation or prosecution, and, later, urging the district court to "take the bull by the horns, and say this isn't fair, I'm not going to apply it under due process principals [sic]." Transcript of Sentencing Hearing at 8. The district court rejected defendant's first argument, then responded:
 
 
 34
 I have two choices.... [o]ne is to take the bull by the horns and say it isn't fair ... or I can apply the law as I see it, that I am required to apply it, and say at the same time, I think this is dread fully [sic] wrong.... I think my record in the Sixth Circuit comes out better if I apply the law and say I think it is wrong.
 
 
 35
 Transcript of Sentencing Hearing at 8.
 
 
 36
 In United States v. Davern, 970 F.2d 1490, 1493 (6th Cir.1992) (en banc), cert. denied, 113 S.Ct. 1289 (1993), this court held that "a Guideline sentence is mandatory." In reaching this conclusion, we looked to the Supreme Court's statement in Burns v. United States, 501 U.S. 129 (1991), that
 
 
 37
 [t]he only circumstance in which the district court can disregard the mechanical dictates of the Guidelines is when it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission...." 18 U.S.C. Sec. 3553(b).
 
 
 38
 Burns, 501 U.S. at 133. Thus, in Davern, we held that "departure is justified only as stated in section 3553(b) [incorporated into the Guidelines as Sec. 5K2.0]." Davern, 970 F.2d at 1493. The district court's dissatisfaction with the operation of the Guidelines is evident from the record, which also makes clear that the district court felt required to enforce without deviation the mechanical dictates of the Guidelines. However, the district court's objections, and defendant's arguments for departure, were based on sentencing philosophy, not on specific circumstances for which the Sentencing Commission failed to make adequate provision. Consequently, although it is possible that the district court completely failed to recognize its discretion to depart from the Guidelines under Sec. 5K2.0, it is also reasonable to interpret the district court's statements as an indication that the court was aware that in this instance, because it could articulate no specific circumstances that would come within the ambit of its discretion to depart, it had no choice but to follow the Guidelines.
 
 
 39
 Even if the district court failed to recognize its limited discretion to depart, the error would not change the result in this case. Despite defendant's lengthy review of the purposes of the Sentencing Reform Act and the concern of Congress and the Sentencing Commission that judges retain flexibility in sentencing, we are nonetheless bound by the Supreme Court's statement in Burns that the only justification for a departure is the presence of an aggravating or mitigating circumstance that was "not adequately taken into consideration by the Sentencing Commission" in formulating the guidelines. Burns, 501 U.S. at 133; 18 U.S.C. Sec. 3553(b); U.S.S.G. Sec. 5K2.0. "[O]nly cases outside the 'heartland' for the crime of conviction warrant departure." United States v. Brewer, 899 F.2d 503, 507 (6th Cir.), cert. denied, 498 U.S. 844 (1990). Defendant has not brought to the attention of the court the existence of any specific mitigating circumstances surrounding her criminal behavior that justify a departure from the Guidelines. In the absence of such factors, a sentencing court must impose a sentence within the guideline range. 18 U.S.C. Sec. 3553(a).
 
 
 40
 Defendant argues that the offense severity of the underlying offense used in determining her base offense level under Sec. 2X3.1 overstates her involvement in the offenses at issue in this case. To suggest that this result creates a mitigating circumstance is implausible. In formulating the operation of Secs. 2J1.2 and 2X3.1, the Sentencing Commission clearly considered the possibility that the severity of the underlying offense would increase the liability attached to a defendant's involvement in the offenses at issue. The Commission surely considered the possibility that a defendant might have played no role in the underlying offense except for the obstruction of its investigation or prosecution, but it determined that a defendant's willingness to participate in such an obstruction should be punished according to the magnitude of the overall offense, not the defendant's role in the cover-up.
 
 
 41
 In this case, defendant attempted to influence the outcome of a federal trial of significant proportions. The trial itself lasted two months. Sturman was charged with a tax loss of approximately six million dollars. Not only were the legal issues complex and far-reaching (covering transactions that took place over a 10-year period), the administration of the trial itself involved complex logistics. See United States v. Sturman, 951 F.2d 1466 (6th Cir.1991), cert. denied, 112 S.Ct. 2964 (1992). Thus, we conclude that application of the cross reference does not result in a sentence for defendant that overstates the severity of her involvement in the offenses at issue. Moreover, we note that defendant's base offense level was increased four levels by application of the cross reference. This increase, while significant, is not so harsh as to be disproportionate to defendant's criminal activity, which showed a blatant disregard for the proper functioning of the justice system.
 
 
 42
 Defendant also asserts that the district court should have departed from the Guidelines because her act of influencing a juror was a single act constituting aberrant behavior. In support of this assertion, defendant relies on cases recognizing an "aberrant behavior spectrum." See United States v. Dickey, 924 F.2d 836, 838-39 (9th Cir.), cert. denied, 502 U.S. 943 (1991); see also United States v. Jagmohan, 909 F.2d 61, 65 (2d Cir.1990). We conclude, however, that the district court's failure to recognize defendant's behavior as aberrant does not constitute error. An aberrant act is a " 'spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning.' " United States v. Duerson, 25 F.3d 376, 381 (6th Cir.1994) (quoting United States v. Carey, 895 F.2d 318, 325 (7th Cir.1990)). Defendant pled guilty to influencing a juror, an offense that involved a course of conduct, not a single spontaneous act. Nor is this a case in which "a whole series of acts lead up to the commission of the crime." United States v. Takai, 941 F.2d 738, 743 (9th Cir.1991). In addition, defendant pled guilty to endeavoring to influence grand jury witnesses, a crime that also has as its purpose the desire to obstruct justice. The fact that defendant pled guilty to two similar crimes evidencing a singular intent to obstruct justice negates the suggestion that either set of actions represented aberrant behavior. Finally, we note that while defendant professed her desire to cooperate with the government, she repeatedly failed to truthfully share her information, indicating again her desire to obstruct the administration of justice. Taking these facts together, there is no evidence on which to base a conclusion that defendant's conduct leading to the charges at issue was in any way aberrant or sufficient to justify a downward departure under the Guidelines.
 
 III.
 
 43
 For the reasons stated, the sentence imposed by the district court is AFFIRMED.