*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0079P (6th Cir.)
File Name: 03a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

    *v.*

RONALD DUPREE,
       *Defendant-Appellant.*

No. 01-1444

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00214—Gordon J. Quist, District Judge.

Argued: December 4, 2002

Decided and Filed: March 17, 2003

Before: KRUPANSKY, SILER, and COLE, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Anthony C. Greene, Grand Rapids, Michigan, for
Appellant. Joan E. Meyer, ASSISTANT UNITED STATES
ATTORNEY, Grand Rapids, Michigan, for Appellee.
**ON BRIEF:** Anthony C. Greene, Grand Rapids, Michigan,
for Appellant. Joan E. Meyer, ASSISTANT UNITED
STATES ATTORNEY, Grand Rapids, Michigan, for
Appellee.

1

---

## OPINION

---

SILER, Circuit Judge. Defendant Ronald Dupree appeals his conviction and sentence for racketeering conspiracy, armed robbery, and unlawful possession and use of a firearm in the commission of a crime of violence. He was sentenced to 87 months on the first two charges and 84 months on the third, to run consecutively to the previous sentence. As set forth below, we affirm the decision of the district court.

### BACKGROUND

In 1999, an armed guard for the Wolverine Armored Dispatch Service was robbed at gunpoint while making his regular pick-up of cash and checks at the Value City Department Store ("Value City") in Wyoming, Michigan. At the time of the robbery, Dupree was employed at Value City as a loss prevention officer and was at the store when the robbery occurred. Two men entered the store shortly after the armored truck guard, Steven Shook, arrived, and followed him to the back of the store. Shook had just taken delivery of two bags of money (one containing $84,685.88 and the other containing $54,328.15) and placed the bags into one canvas bag when he was confronted by Brian Tufnell. Tufnell held a gun to Shook's chest; his accomplice, Reginald Clopton, took the canvas bag and the two ran out of the store. Tufnell and Clopton were ultimately arrested. Tufnell pled guilty to racketeering conspiracy, armed robbery, and being a felon in possession of a firearm, and received a sentence of 102 months. Clopton pled guilty to racketeering conspiracy and armed robbery, and was sentenced to 63 months.

Dupree was indicted on charges of racketeering conspiracy, armed robbery, and unlawful possession and use of a firearm in the commission of a crime of violence. At trial, both Tufnell and Clopton testified that Dupree helped plan the robbery (using knowledge gained as Value City's loss prevention officer and from former employment as a guard for

and the parties have not called it to the court's attention that he was reprimanded for this in any way. Moreover, Hunt testified that she recommended Dupree, in part, for his video expertise; while he apparently did not change the configuration of recorders that day in the control room, Hunt reaffirmed her testimony that the direction of at least one camera had been changed. Indeed, Dupree's greater flexibility in his job is evidenced by the indication in the government's brief that he may not even have been scheduled to work the day of the robbery, but came in anyway.[14] The level of discretion Dupree enjoyed in his job, as evidenced by the nature of his job functions, the expertise he possessed, and his involvement in the investigation of the robbery, indicate that the district court did not err in applying this enhancement.

**AFFIRMED.**

---

[14] The testimony was that employees such as Dupree were supposed to "clock in," as in *Hoskins*, but that Dupree did not do so the day of the robbery, and never asked to be paid for work that day.

to analyze whether his position was characterized by the requisite managerial or professional discretion, concluding that it was not:

> He was subject to supervision and his duties as a security guard were quite circumscribed. Hoskins's primary responsibility was simply to monitor video surveillance of the store and to call 911 in the case of any suspicious activity. An additional responsibility was to look for and rectify minor safety problems. Nothing in the record suggests that he enjoyed any sort of meaningful discretion in carrying out those responsibilities. . . .It was not difficult for K Mart's management to objectively and expediently determine Hoskins's honesty or observe his whereabouts. A quick check of the security booth was all that was required to see if Hoskins was on duty. Hoskins was supposed to be sitting in the security room watching security monitors between 8:00 and 10:00 am. He was required to clock-in. Indeed, Hoskins's supervisor warned Hoskins that K Mart nearly fired another employee for leaving the security office to use the restroom. Generally, those occupying positions characterized by professional or managerial discretion would not be subjected to such harsh consequences for taking a bathroom break.
> In short, Hoskins was an ordinary employee who had no management function and virtually no discretion in the exercise of his duties. Hoskins offered K Mart no special skill or knowledge. The fact that he was associated with store security is insufficient to overcome the absence of these key criteria.

*Id.* at 779.

Certain facts readily distinguish this case from *Hoskins*. For example, there is no indication that Dupree was required to stay in one particular place for any set time; instead, he was able to walk around the sales floor (a normal occurrence) and, apparently, come and go in the security room as he wished. Indeed, he was in the bathroom when the robbery occurred,

an armored truck service) and that he supplied the gun used in its commission. Dupree was convicted of all charges and was sentenced to a total of 171 months.

## STANDARD OF REVIEW

To the extent Dupree makes a constitutional challenge to his conviction under the Hobbs Act, this issue is viewed as a question of law and is reviewed *de novo*. *See United States v. Smith*, 182 F.3d 452, 455 (6th Cir. 1999). To the extent he argues that the evidence was insufficient to support this conviction, this court must determine "whether after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000) (internal quotation marks omitted) (emphasis in original). In reviewing the denial of Dupree's motion to suppress, this court upholds the district court's findings of fact unless they are clearly erroneous, and reviews its legal conclusions *de novo*. *United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir. 1997). The court reviews the trial court's denial of Dupree's motion for a new trial under an abuse of discretion standard. *United States v. Gaitan-Acevedo*, 148 F.3d 577, 589 (6th Cir. 1998). Although Dupree asserts, without authority, that this court should review his claim of prosecutorial vindictiveness *de novo*, ordinarily such claims are reviewed for clear error. *See United States v. Sammons*, 918 F.2d 592, 601 (6th Cir. 1990). Of course, there is no lower court finding to review, as Dupree has raised this claim for the first time on appeal. Finally, with regard to Dupree's challenges to his various sentence enhancements, "[t]his court reviews a district court's application of the Sentencing Guidelines *de novo*, and the district court's findings of fact thereunder for clear error." *United States v. Cowan*, 196 F.3d 646, 647-48 (6th Cir. 1999).

## DISCUSSION

### A.   Hobbs Act

Dupree was convicted of racketeering conspiracy and armed robbery in violation of the Hobbs Act, which provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). This "broad jurisdictional language" has historically been construed as requiring only a *de minimus* effect on interstate commerce. *See United States v. Mills*, 204 F.3d 669, 671 (6th Cir. 2000). Dupree, however, argues that, in light of recent precedents abrogating the broad construction of the Commerce Clause – including *United States v. Lopez*, 514 U.S. 549 (1995), *United States v. Morrison*, 529 U.S. 598 (2000), and *Jones v. United States*, 529 U.S. 848 (2000)[1] – the government failed to meet its burden of showing a sufficient effect on interstate commerce to meet the jurisdictional predicate for his prosecution under the Hobbs Act.

---

[1] In *Lopez*, the Supreme Court found that Congress's enactment of the Gun-Free School Zones Act of 1990 exceeded the scope of its authority under the Commerce Clause, in that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Lopez*, 514 U.S. at 567. More recently, in *Morrison*, the Court invalidated the civil remedy provision of the Violence Against Women Act, finding that it did not regulate activity that substantially affected interstate commerce. In *Jones*, the Court reversed a defendant's conviction under the federal arson statute; arson of an owner-occupied private residence which was not used for any commercial purpose did not constitute "commerce-affecting activity." *Jones*, 529 U.S. at 850-51.

importantly, the facilitation argument emphasizes only one requisite element. As this court has more recently held:

> According to our own precedent, and to the application notes in the Sentencing Guidelines themselves, the level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position. The cited cases have too often emphasized, we believe erroneously, the supervision an employee receives. The examples given in the application notes (physician, attorney, and fiduciary) imply that the inherent nature of the work itself should naturally convey a substantial degree of discretion to the defendant concerning how to properly administer the property of another or otherwise act in their best interest.

*United States v. Tribble*, 206 F.3d 634, 637 (6th Cir. 2000).

Turning to the nature of Dupree's work, we note a factually similar case from another Circuit, *United States v. Hoskins*, 282 F.3d 772 (9th Cir. 2002), *cert. denied*, 122 S.Ct. 2610 (2002). In that case, Hoskins, who had been working as a K-Mart security guard for about a month, helped plan and execute a robbery of the store. Although his job required him to sit in the store's security room and watch the security monitors between 8:00 a.m. and 10:00 a.m. each morning, on the morning of the robbery, Hoskins stationed himself on the sales floor. *Id.* at 775. After receiving a signal from Hoskins, the robber, Gregge, followed Hoskins to the cash room and, with a gun, ordered the cash room attendant to open the "cage" where the cash was kept and to lie down on the floor next to Hoskins. Gregge had the cash room attendant handcuff herself to Hoskins, and instructed them to stay down. He then collected the money and left. *Id.* In reviewing the sentencing judge's imposition of the § 3B1.3 enhancement, the court noted that there was no question that Hoskins had used his position to help commit the robbery (even playing the victim), but that this was not the same as having abused a position of trust. The court then proceeded

Cir. 1994). In *Duerson*, the enhancement was held to apply to a managerial employee of the United Parcel Service ("UPS"), who robbed a UPS dispatcher and armored truck courier of more than $185,000. The court affirmed the district court's finding that Duerson had exploited his position as a manager, in a way that substantially facilitated the crime, by:

> cutting through the security restrictions applicable to lower-level employees so that he could learn where everything was located, including the deposit vault; . . .taking advantage of his access to the keys to the two UPS vehicles used in the getaway; . . . reviewing the telephone system so that he could disable it; and . . . questioning a UPS truck manager about the Federal Armored courier's schedule.

*Id.* at 383. The court observed that "[i]t would have been far more difficult for the defendant to commit the crime and make good his escape. . .if he had not held a position of trust or had not possessed special skills in computers and electronics." *Id.* The majority of the court's discussion of the enhancement, however, was devoted to rejecting Duerson's argument that the victim of the robbery was the armored truck service, with whom he held no position of trust, rather than UPS. *Id.* at 383-84.[13]

*Duerson*, however, places a great deal of emphasis on facilitation of the crime, and, in that aspect, is distinguishable in degree from the instant case. Here, Dupree did not actually commit the robbery. Even if he facilitated it, this facilitation did not rise to the level of activity in *Duerson*. Still, Dupree's reliance on the fact that the cameras he is alleged to have moved were not recording is misplaced; even without affecting the recording, there were other ways Dupree's alleged actions could have facilitated the crime. More

---

[13]Similarly, we should reject such implication by Dupree, who repeatedly notes that he was not an employee of the armored car company in this case.

Dupree relies primarily on *United States v. Wang*, 222 F.3d 234 (6th Cir. 2000), for support. In that case, this court held that the robbery of a couple in their home did not have a substantial effect on interstate commerce, requiring the reversal of Wang's conviction under the Hobbs Act. Specifically, we observed that "our precedents have involved robberies in which the victims were businesses engaged in interstate commerce. But where, as here, the criminal act is directed at a private citizen, the connection to interstate commerce is much more attenuated." *Id.* at 238. Proceeding from *Wang*, Dupree characterizes the crime in the instant case as the robbery of an individual, notes that the armored car service for which that individual worked did not operate outside of Michigan, and contends that the government has not shown a sufficient interstate nexus. This argument is not persuasive. The robbery in this case targeted an armored car messenger, engaged in the performance of his duties, inside a department store on his regular route. Shook had just taken possession of $130,014.03 in cash and checks – not an insignificant sum – when he was robbed. This situation is clearly distinguishable from the robbery of private citizens, in their residence, in *Wang*.

In *United States v. Smith*, 182 F.3d 452 (6th Cir. 1999), this court held that the traditional *de minimus* standard for Hobbs Act violations survived *Lopez*, so that "if a statute regulates an activity which, through repetition, in [the] aggregate has a substantial effect on interstate commerce, the *de minimus* character of individual instances arising under the statute is of no consequence." *Id.* at 456 (internal quotation marks omitted). *Wang* recognized this holding, but "stated that the required showing 'is of a different order' when the victim is a private citizen, rather than a business entity engaged in interstate commerce." *United States v. Garcia*, 143 F. Supp. 2d 791, 810 (E.D. Mich. 2000) (quoting *Wang*, 222 F.3d at 238). The instant case does not fall within this exception. Although the money in the robbery was taken from an armored truck guard, it had just been picked up from a Value City Department Store. Value City is engaged in interstate commerce and the money, although in the custody of the

armored truck company, was destined for a deposit on behalf of Value City and was not the property of the armored truck company. The armored truck company also had insured the proceeds with an out-of-state insurance company. The facts of this case do not require "long chains of causal inference . . . to arrive at a substantial effect on interstate commerce," nor the type of "'butterfly effect' theory of causation" eschewed in *Wang. See Wang*, 222 F.3d at 239. The government sufficiently established the jurisdictional predicate for Dupree's prosecution under the Hobbs Act.

## B.   Motion to Supress

Dupree next contends that statements he made to the police following his arrest should not have been admitted at trial. Specifically, he contends that his counsel had an informal agreement with the government, whereby counsel would be notified if Dupree was to be arrested, and Dupree would turn himself in. When he was arrested, however, his counsel was not notified and was not present when Dupree spoke with FBI Agent Roberta Gilligan (who knew he was represented by counsel) for approximately an hour and a half.[2]   Though Dupree signed two written waivers (one waiving his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and another counsel-specific waiver) before speaking with Gilligan, he contends that these statements were obtained in violation of his rights under the Fifth and Sixth Amendments, and that their admission forced him to testify at trial.[3]

---

[2]The government disputes the existence of any informal agreement to this effect, though counsel for the United States recounted to the trial judge that he had told Dupree's counsel that he would be "predisposed" to giving him notice and an opportunity for Dupree to turn himself in prior to any arrest. Counsel also stated, however, that in the interim, the government learned that the weapon used in the robbery was hidden in Dupree's house, so that it feared destruction of evidence if any advance warning of Dupree's arrest was given.

[3]Gilligan testified at trial that Dupree told her, in this interview, that he knew Clopton and Tufnell wanted money, were serious about the robbery, and had visited Value City prior to the robbery to familiarize

Dupree contends that the district court erred by deeming his job a "position of trust." He cites the Application Notes to § 3B1.3, which provide that a position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." The Application Notes go on to distinguish, for example, the embezzlement of a client's funds by an attorney serving as guardian (a situation in which the enhancement would apply) from embezzlement or theft by an ordinary bank teller or hotel clerk (situations to which the enhancement would not apply, because these positions are not characterized by the requisite discretion). Dupree also contends that the requirement that the use of the position significantly facilitate either the commission or the concealment of the offense is not met in his case, because the store surveillance cameras he is alleged to have moved were not recording. Dupree analogizes his case to *Ragland*, 72 F.3d at 500, in which a bank's customer service representative, who engaged in a fraud scheme by forging the signatures of bank officers and taking funds deposited by customers, was held not to have occupied a position of trust for purposes of the enhancement.

The government, however, acknowledges *Ragland* and other precedents finding defendants not to have occupied positions of trust, but attempts to distinguish them by arguing that Dupree had a "fiduciary-like" relationship with the store, marked by great discretion, which included "intimate knowledge of the cash transfer of store sales receipts, . . .access to . . .store surveillance cameras, and . . .involv[ement] in any investigation of wrongdoing at the store, including the investigation of this crime." The government further notes Dupree's attempts to cast suspicion on a store manager and the armored truck guard in the aftermath of the robbery, while at work. These aspects of Dupree's conduct, the government argues, render this case more similar to *United States v. Duerson*, 25 F.3d 376 (6th

He was the guy who was hired because of his experience and special expertise in the area of security. He had knowledge that others did not have, and he also had access that others did not have. For example, he knew the location and sight lines of the cameras; he moved the cameras. He knew the time and day of arrival of the armored cars and when there would be more money. He had access to the monitor room so people could not observe his co-defendants. Not all employees had that kind of trust and responsibility placed in them.

He's, like I said, not a sales clerk. He was the person entrusted with security. And he violated the trust placed in him in that he set up and permitted this particular robbery to take place. . . .Of all the places that Tufnell and Clopton could have robbed. . ., why would they pick the only store where the person in charge of security could recognize them? That was the Value City Store. I mean, they knew. No one disagrees with the fact that they knew Mr. Dupree. Why would they pick the one store, without wearing masks, where the security guard would recognize them? And that shows that they picked a store because they knew that it was set up for them and that the employer of Mr. Dupree trusted Mr. Dupree and put that kind of trust in him.

It's not a position of trust in the same sense, perhaps, that a bank vice-president has as distinguished from a bookkeeper or a teller at a bank. I don't think a teller has a position of trust. I think a vice-president does. But here you have the specific person in charge of security who is trusted to enforce security, not to compromise the security or betray it, actually.

So I'm going to give him two points for breach of position of trust.

Our review of the district court's determination that Dupree held a position of trust for purposes of the enhancement is *de novo*. *United States v. Ragland*, 72 F.3d 500, 502 (6th Cir. 1996).

Dupree cites the proposition enunciated in *Edwards v. Arizona*, 451 U.S. 477 (1981), that once an accused invokes his right to counsel during custodial interrogation, that interrogation must cease until counsel is made available, unless the accused initiates further communication with the police. *See id.* at 484-85. Further, *Edwards* stated that even in a meeting initiated by the accused,

it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.* at 486 n.9. Dupree argues that he was represented, a fact which was known by the FBI, and despite the existence of the informal agreement, his counsel was never contacted; thus, under the totality of the circumstances, his waiver was not knowing and intelligent.

*Edwards*, however, is inapplicable, as Dupree does not assert that he asked for counsel. The request for counsel must be express and unambiguous in order to require the cessation of questioning. *See Davis v. United States*, 512 U.S. 452, 459 (1994). Moreover, "[t]he mere fact that the government is aware that a suspect has an attorney, or is soon to have one, does not unambiguously assert the suspect's right to deal exclusively with the police through counsel during custodial

themselves with its layout and to observe the armored car messenger. Dupree had told Tufnell and Clopton that he had formerly worked as a messenger for an armored car company. Gilligan also said that Dupree knew that Tufnell had gone into the store previously, intending to rob the guard, but did not because there were too many people around. Finally, Gilligan recounted Dupree's admission that, three or four days before the robbery, he had given his gun to Clopton, and got it back a day or two after the robbery. Dupree purportedly told Gilligan that he suspected Tufnell had committed the robbery.

interrogation." *United States v. Suarez*, 263 F.3d 468, 483 (6th Cir. 2001), *cert. denied*, 535 U.S. 991 (2002). Gilligan testified that, when she interviewed Dupree, he did not appear to be under the influence of any drugs or alcohol, and he was coherent and articulate. She told him that she was not there to question him, and instructed him to read the complaint. Gilligan further testified that, when Dupree indicated that he wanted to talk, she advised him "You make sure that's really what you want to do. . . .You don't have to do this. But you really have to be sure if that's what you want to do." Dupree signed two separate waivers (initialing each paragraph), which were witnessed by another detective and produced at trial. Though counsel for Dupree asserts that "[t]he record in this case is not so clear" regarding whether the waivers were voluntarily signed, Dupree does not challenge Gilligan's testimony or present any facts which would lead the court to conclude otherwise. Under the totality of the circumstances, the statements were properly admitted.[4]

### C.   Motion for a New Trial

At trial, Jean Hunt, the manager of the loss prevention department at Value City,[5] testified that store policy dictated that a store surveillance camera be directed toward the front doors of the store at all times. A person could only change the direction of the cameras from the loss prevention office, to which only upper management and the loss prevention department (she and Dupree) had access. She further testified that, when she left the loss prevention office to go to a regularly-scheduled management meeting (during which the robbery was committed), a camera was focused on the front

---

[4] Given this conclusion, it is unnecessary to address the parties' dispute as to whether any error in admitting the statements would be harmless.

[5] Hunt had previously worked with Dupree as a messenger for the Brinks armored car company; she considered him a friend, and had recommended him for the job in loss prevention at Value City, due to his extensive knowledge of camera systems.

direct control or ultimate decision-making authority . . . is not required for leadership enhancement." *United States v. Cruz*, No. 98-1970, 2000 WL 377060, at *4 (6th Cir. Apr. 7, 2000). Finally, in a very recent and strikingly similar case, this court affirmed the following findings of the district court as sufficient to support an enhancement:

> With respect to the Red Zone [Nightclub], [the defendant] had inside information essentially. He was the director of security; he knew the internal operations of the Red Zone, he provided [the robber] not only with the internal plans of the layout of the Red Zone but he told him about, you know, the time that everything crucial to the robbery took place. He gave [the robber] the tools necessary to complete the robbery; he arranged for [the robber] to travel into town to commit the robbery; he showed him where to break in and detailed how it would be best to break in, and advised him as to where the money was stored. [The defendant] provided [the robber] with the knife, duct tape and two-way radio to use. And so when you look at all those things together, it's fairly clear that a two-level enhancement is appropriate as he was the leader and organizer.

*United States v. Taniguchi*, Nos. 00-4495, 00-4496, 2002 WL 31371978, at *12 (6th Cir. Oct. 11, 2002). Given this court's recent reference to a more deferential standard of review, we uphold the enhancement based on the district court's findings.

### 3.   Abuse of a Position of Trust

Finally, Dupree contends that the district court erred by applying the two-level enhancement articulated in § 3B1.3 of the Sentencing Guidelines, which applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." The district court held:

> Mr. Dupree was the person at Value City at . . .the time of the robbery – who was entrusted with security at the store. He was not a sales clerk, a stocker or bookkeeper.

1997)).  Even more recently, however, in an unpublished opinion, this court indicated that the "standard of review for enhancements under § 3B1.1 is now open to question," due to the Supreme Court's determination in *Buford v. United States*, 532 U.S. 59 (2001), that a district court's application of USSG § 4B1.2 should be reviewed under a deferential standard, rather than *de novo*. *United States v. Williams*, No. 01-6358, 2002 WL 31388757, at *1-2 (6th Cir. Oct. 22, 2002) (observing that "[a] single clear-error standard is consistent with the Supreme Court's *Buford* holding).[12]

In the instant case, it appears that the district court applied the enhancement of § 3B1.1, rather than upwardly departing. Further, though the district court clearly enumerated its factual findings regarding this enhancement, it did not explicitly find that Dupree led, organized, managed, or supervised any of the other participants. We can infer this finding, however, from the district court's enumerated facts. The key is that Dupree supplied the gun and insider information about the store and the armored truck service; in this sense, he supervised Tufnell and Clopton. Another recent case quotes the background notes to § 3B1.1(c), which state that:

> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of §3B1.1(c).

*United States v. Cowherd*, No. 99-5377, 2000 WL 1478373, at *3 (6th Cir. Sept. 28, 2000).  Additionally, "evidence of

---

[12]In *Williams*, however, the court found that the application of the enhancement would be affirmed under either a deferential or *de novo* standard, due to the district court's finding that the defendant supervised another participant during the offense. *Id.* at *2.

of the store; when she returned, immediately after the robbery, that camera was focused toward the back of the store, in housewares.  Hunt stated that she had not moved the camera, and that there was no one other than Dupree who had a key to the loss prevention office and was at work that day, but was not at the management meeting.

Following the trial, in preparation for sentencing, the district court read a letter it had received from Hunt prior to the trial.[6]  The letter stated, in part:

> I know one of the things they were saying was Ron moved the cameras, the cameras are for surveillance on shoplifters in the store the only time there [sic] on a door is when your [sic] not watching someone.  I was using the recorder to record a cashier who was suspected of stealing.  Ron would not have known that until he came in that day.  We only had one recorder hooked to a camera.  Thats [sic] the one I was using.

The district court, recognizing the potential inconsistency with Hunt's testimony at trial, forwarded the letter to the parties; Dupree filed a motion for a new trial and the court held an evidentiary hearing.  At that hearing, Hunt reaffirmed her trial testimony that the camera had been moved, but clarified that any camera directed at the door would not have been recording activity on tape.  The court denied Dupree's motion for a new trial, finding that the letter did not impeach Hunt's testimony, as there were reasons Dupree might have moved the camera from the front doors even if it was not recording (for example, to avoid the possibility that someone would walk into the loss prevention department and observe the robbers on the monitor).  The court also found that a reasonable jury could have found the testimony of Tufnell and Clopton credible, and, combined with the objective evidence linking Dupree to the crime, "could lead to a conclusion by a

---

[6]The letter was sent for use at Dupree's sentencing, before he decided to withdraw his plea and go to trial; the district court, however, did not read the letter until after the trial.

reasonable jury. . .that the defendant was guilty beyond a reasonable doubt."

Dupree argues that the revelation that the camera which had been focused on the front door could not record greatly affects the government's efforts to link him to the conspiracy, in that it undermines the necessity of his being present at work that day (to ensure that the camera pointed at the front doors would not record the robbers).[7]  He further asserts that this fact was presented in a confusing fashion, "which likely left the opposite impression from what the real facts were," and entitles him to a new trial. This Circuit recognizes a four-part test in determining whether newly-discovered evidence warrants a new trial: (1) the evidence was discovered after the trial; (2) it could not have been discovered earlier with due diligence; (3) the new evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal if the case were retried. *United States v. Glover*, 21 F.3d 133, 138 (6th Cir. 1994). The district court found the first two factors satisfied, but ultimately concluded that Hunt's letter did not impeach her trial testimony, and that the evidence was such that it would not have produced an acquittal.

"[M]otions for a new trial based on newly-discovered evidence are disfavored and should be granted with caution." *Glover*, 21 F.3d at 138.  Though Hunt's letter might be viewed as impeaching her trial testimony that it was store policy to have a camera focused on the front doors at all times, she reaffirmed her testimony that the camera was moved. There may have been some confusion at trial as to whether the camera focused on the front door was recording, but the trial court was correct in noting that Dupree would have had reasons for being at the store that day and for moving the camera apart from its ability to record the robbers'

[7]Clopton had testified at trial that he was concerned about being videotaped by the Value City surveillance cameras, particularly the one trained on the front door, but that Dupree told him not to worry because he had access to "take care of" the cameras.

with defense counsel that it was not warranted.  *Id*. at 809. On appeal, this court noted that, as Vandeberg had pled guilty, the district court "lacked the advantage of having observed a trial." *Id*. at 810.  Moreover, we reviewed the record and determined that:

> Although Vandeberg provided [the burglar], his co-conspirator, information crucial to helping [the burglar] burglarize the house, there is no indication that Vandeberg either recruited [the burglar] or exercised any authority over him. . . .Vandeberg neither claimed a right to a larger share of the fruits of the crime, nor took a leadership role in planning the details of the offense. Rather, it appears that [the burglar] initiated the criminal activity, exercised his own decision-making authority, and retained possession over many of the stolen items.

*Id.* at 811.  This case suggests a lower level of involvement than exists in our case, because Dupree provided the gun used, moved the surveillance cameras, and was at work at the time of the robbery.

In *United States v. Caseslorente*, 220 F.3d 727 (6th Cir. 2000), this court recounted the history of the § 3B1.1 enhancement, noting that, prior to 1993, the Sixth Circuit held that "it was sufficient to show merely that a defendant exercised some measure of leadership over the criminal activity" for the enhancement to apply. *Id.* at 734. This view contrasted with that of other Circuits, which required a showing that the defendant exercised control over at least one *participant* in the criminal scheme. *Id.* In 1993, however, Application Note 2 of the commentary to § 3B1.1 was amended to clarify that, while the defendant must have led, organized, managed or supervised another participant in order to qualify for a sentence enhancement, an upward departure might be justified where the defendant exercised management responsibility over the criminal organization's property, assets, or activities.  This distinction was confirmed in subsequent cases. *See Caseslorente*, 220 F.3d at 735 (citing *United States v. Gort-DiDonato*, 109 F.3d 318 (6th Cir.

had selected the bank to rob, recruited them to assist, rented a car and a motel room in preparation for their flight, provided the weapon as well as materials to restrain the bank employees, disabled the surveillance camera, and took the tape. *Parker*, 2001 WL 133121, at *2. The defendant had also disposed of incriminating evidence and taken a larger share of the proceeds from the crime, purportedly to pay off an "insider" at the bank. *Id.* These cases are marked by a higher level of leadership or control than is alleged in the instant case.

Further, the government's assertion that *Tocco* compels the application of this enhancement to Dupree, due to its holding that where co-conspirators cannot engage in extortionate activities without the defendant's permission, it is reversible error not to apply the enhancement for the defendant's supervisory role, is not persuasive. *See Tocco*, 200 F.3d at 432. The court's finding in *Tocco* involved an alleged mafia boss whose control over co-conspirators was established by wiretapped conversations. *Id.* Dupree's "control over extortionate activity" alleged here by the government consists of his actions in allegedly taking Tufnell and Clopton through the store, pointing out the cash window, and familiarizing them with the layout. This conduct, however, is more akin to that held *not* to warrant a supervisory enhancement in *Vandeberg*, 201 F.3d at 805. In that case, an acquaintance of Vandeberg burglarized the home of Vandeberg's employer; Vandeberg had relayed information regarding the location of the home, the alarm system, and the location of a safe containing items of value. *Id.* at 808. Nevertheless, this court found that Vandeberg's act of providing this "crucial information" to the burglar was not enough to trigger the enhancement, and clarified that "[m]erely playing an essential role in the offense is not equivalent to exercising managerial control over other participants and/or the assets of a criminal enterprise." *Id.* at 811.

*Vandeberg*, though, is likewise distinguishable. In that case, the district court summarily imposed the enhancement for leadership despite the fact that the government agreed

entry. Moreover, Hunt apparently never stated, at trial, that the camera focused on the front doors *was* recording; she testified that only two cameras could record at a time, but that a person could switch which camera was recording by pushing a button. Given these circumstances, the trial court did not abuse its discretion in denying Dupree's motion for a new trial based on Hunt's letter. *See, e.g., Glover*, 21 F.3d at 138-39 (testimony of convicted drug dealer that he, not the defendant, hid cocaine in residence was unlikely to produce an acquittal if case were retried).

### D.    Prosecutorial Vindictiveness

Dupree contends that the fact that he was charged with and convicted of violating 18 U.S.C. § 924 (c) (1) (A) (ii) – brandishing a firearm during and in relation to a crime of violence – despite the knowledge that (1) only Tufnell possessed and brandished the firearm, and (2) this charge was dropped against both Tufnell and Clopton,[8] constitutes prosecutorial vindictiveness. To establish vindictive prosecution, Dupree must show:

> (1) exercise of a protected right; (2) the prosecutor's "stake" in the exercise of that right; (3) the unreasonableness of the prosecutor's conduct; and, presumably, (4) that the prosecution was initiated with the intent to punish the plaintiff for the exercise of the protected right. Thus, a person claiming to be vindictively prosecuted, must show that the prosecutor had some "stake" in deterring the petitioner's exercise of his rights, and that the prosecutor's conduct was somehow unreasonable.

*Nat'l Eng'g & Contracting Co. v. Herman*, 181 F.3d 715, 723 (6th Cir. 1999) (internal quotation marks and citations omitted). There are two approaches to showing prosecutorial vindictiveness: a defendant can show (1) "actual

---

[8]The government contends Clopton was never charged with this Count.

vindictiveness," by producing "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights," or (2) "a realistic likelihood of vindictiveness," by utilizing the framework outlined above (focusing on the prosecutor's "stake" in deterring the exercise of a protected right and the unreasonableness of his actions). *Bragan v. Poindexter*, 249 F.3d 476, 481-82 (6th Cir. 2001). Attempting to show actual vindictiveness has been characterized as "exceedingly difficult" and an "onerous burden." *Id. at* 481, 483.

Regardless of whether this court reviews Dupree's claim *de novo* or for clear error, it fails. He argues that the prosecutor failed to drop the firearms charge against him because he exercised his protected right to a jury trial, and further asserts that the plea offer was designed to deter him from going to trial. It is significant to note, however, that Dupree is not asserting that the prosecutor *added* any additional, or more severe, charges to the indictment after he elected to go to trial; he merely argues that the prosecutor failed to *drop* Count III[9] against him, as he did for Tufnell when Tufnell pled guilty. The prosecutor's conduct in proceeding with the full indictment, however, cannot be viewed as unreasonable. The Supreme Court has recognized that "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Moreover, with regard to the prosecutor's "stake" in avoiding a trial, the Court "has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty." *Id.* at 364. In *Bordenkircher*, the Court held that there was no Due Process violation where the prosecutor reindicted the defendant on more serious charges in response to the defendant's decision not to plead guilty. The prosecutor

---

[9]According to the government, Tufnell still pled guilty to being a felon in possession of a firearm.

2001); *United States v. Parker*, No. 99-2072, 2001 WL 133121 (6th Cir. Feb. 5, 2001); *United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000).

The question of whether Dupree or Tufnell first proposed the robbery is muddled somewhat by Tufnell's own testimony regarding his "dream" to rob an armored car. Tufnell did, however, go on to relate that Dupree first mentioned Shook as a possible target. Tufnell also stated that Clopton was not involved when he and Dupree first started talking, but that he, Tufnell, got Clopton involved. This account was corroborated by Clopton. Further, on cross-examination, Tufnell characterized Dupree as having "planned and masterminded" the robbery. The district court was privy to all this testimony, however, and had the unique opportunity of judging the credibility of the witnesses. Moreover, the district court's findings that Dupree supplied the gun, provided information as to when the armored truck would arrive, signaled to Tufnell and Clopton when it was late, and moved the surveillance cameras are relevant to the factors of participation in planning the offense and exercise of decision-making authority. It does not appear that Dupree recruited the others or claimed a larger share of the proceeds from the robbery. Additionally, it is undisputed that following the robbery, Clopton kept control of the money and dispensed it in relatively small amounts to Tufnell and Dupree. Clopton also took responsibility for hiding the guns, eventually returning Dupree's to him.

The cases cited by the government as "compelling" the enhancement in the instant case, *Bandy* and *Parker*, are largely distinguishable. In *Bandy*, the defendant admitted that he and a co-defendant planned and executed the robbery, that he wielded a pellet gun and ordered the bank manager to get the money, and that he had stolen the getaway car and license plate in preparation for the robbery. *Bandy*, 239 F.3d at 804. His co-defendants testified that Bandy had recruited them to rob the bank, provided the weapons, and made them follow through with the crime when they showed reluctance to do so. *Id.* In *Parker*, the defendant's accomplices testified that he

role of leader: (1) It was Clopton's van used for the robbery; (2) Clopton took the guns after the robbery; and, (3) Clopton controlled the money from the robbery.

Dupree thus contends that the district court misapplied the factors recognized by this court as relevant to determining whether the § 3B1.1 enhancement applies, which include "the defendant's exercise of decision-making authority, any recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning the offense, and the degree of control the defendant exercised over others." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (internal quotation marks omitted).

The burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies. *United States v. Martinez*, 181 F.3d 794, 797 (6th Cir. 1999). "Determining the nature and extent of the role [Dupree] played in the offense entails a factual inquiry, which we review only for clear error." *United States v. Blandford*, 33 F.3d 685, 710 (6th Cir. 1994). 18 U.S.C. § 3742(e) states that we should give "due deference to the district court's application of the guidelines to the facts." The government acknowledges the factors which inform the determination of whether the enhancement is applicable, and cites the district court's findings that Dupree first suggested the robbery, furnished the gun used, determined when the armored truck would arrive, moved the surveillance cameras, and signaled to Tufnell and Clopton when the truck was late.[11] The government also cites several cases which it contends compel application of this enhancement to Dupree. *See, e.g., United States v. Bandy*, 239 F.3d 802 (6th Cir.

---

[11]This last finding is supported by Tufnell's testimony that he and Clopton arrived at Value City around noon on the day of the robbery and waited in the parking lot for the armored truck to pull up. Tufnell stated that, at one point, Dupree came out of the front of the store, looked in their direction, and "threw his hands up like 'I don't know where they're at, but it's still a go.'" Dupree then went back into the store. Clopton testified that the armored truck arrived after 2 p.m.

admitted he had made this threat during plea negotiations, and the defendant's conviction on the more severe charge resulted in a mandatory life sentence. *Id.* at 358-61. This court has summarized *Bordenkircher* as holding "that actual retaliatory behavior is acceptable, at least in the plea bargaining context." *United States v. Andrews*, 633 F.2d 449, 456 (6th Cir. 1980); *see also Suarez*, 263 F.3d at 479 ("prosecutorial vindictiveness can potentially be found in the pre-trial addition of charges following pre-trial assertions of protected rights. However, if the charges are brought simply as the result of failure of the plea bargaining process, they are not vindictive.") (citations omitted). Given the fact that Dupree has not even alleged the addition of new charges following his decision to go to trial, his arguments on this issue are unavailing.

### E.   Sentence Enhancements

#### 1.   Taking of a Weapon

Because the robbers took the armored car guard's weapon from him during the robbery, the district court applied the enhancement enunciated in § 2B3.1(b)(6) of the Sentencing Guidelines: "If a firearm, destructive device, or controlled substance was taken, or if the taking of such item was an object of the offense, increase by 1 level." Dupree challenges this enhancement by noting the undisputed fact that he did not actually take the weapon from the guard, and arguing (without authority or elaboration) that "[c]ase law does not support the court scoring this factor. There is no evidence that the Appellant had any reason to believe that a weapon would be taken from the guard." Acts committed in furtherance of a joint criminal enterprise which are reasonably foreseeable can be attributed to all individuals involved in the enterprise. *United States v. Patton*, Nos. 93-5271, 93-5272, 93-5310, 1993 WL 432838, at *2 (6th Cir. Oct. 26, 1993) (citing USSG § 1B1.3). Whether a co-conspirator's actions were reasonably foreseeable is a factual finding reviewed for clear error. *United States v. Tisdale*, 952 F.2d 934, 938 (6th Cir. 1992).

The district court made the following findings in relation to this enhancement:

> Mr. Dupree knew that the armored car guards were armed when they went into Value City. He gave his gun to Mr. Tufnell, who must be a thug by anybody's description. It was certainly foreseeable by Mr. Dupree that Mr. Tufnell and Reginald Clopton would disarm the armored car guard.[10]

Aside from the bare assertion that Dupree had no reason to believe that the guard's weapon would be taken, Dupree does not contest the district court's findings of fact. Given the fact that the robbers knew the armored car guard would be armed, and carried a gun in case they were unsuccessful in disarming him, the district court's finding that the taking of the guard's weapon was reasonably foreseeable is not clearly erroneous.

### 2.    Role as Organizer or Leader

Pursuant to § 3B1.1(c) of the Sentencing Guidelines, the district court enhanced Dupree's sentence by two levels upon finding that he was an organizer, leader, manager, or supervisor. The court based this enhancement on the following factual findings:

---

[10]Tufnell testified that he did not own a gun because he was a convicted felon. Clopton testified that he, Tufnell, and Dupree discussed the possibility that they might not be able to get the armored car guard's gun during the robbery, and concluded that they would need a gun "just in case shots were fired." Tufnell recounted that he obtained a nine millimeter semi-automatic pistol from Dupree; though it was initially unloaded, Tufnell later asked for the clip to the gun, which Dupree left at Tufnell's apartment. Clopton testified that after the robbery, he hid Dupree's gun behind the restaurant, and Dupree retrieved it (along with $6000 of the proceeds from the robbery) later that night. Clopton also stated that, after he was arrested, he told the FBI where Dupree kept his gun. The FBI and local police recovered the nine millimeter semi-automatic pistol from Dupree's residence, in the place Clopton had specified, when they later executed a search warrant.

> First, Mr. Dupree was a person who first suggested the robbery. Second, he furnished the gun for the robbery. Third, he determined the time that the robbery would occur; that is, when the armored car would arrive. Fourth, he moved the cameras. Fifth, he signaled to his co-conspirators that he did not know why the truck had not arrived. In other words, it's hard to tell, I think – I think a good argument could be made that he was a leader. He certainly orchestrated it in the sense that he furnished the idea, the weapon, and the specific timing of the robbery. Maybe that adds up to being a leader, too, but I don't know that I have to really go that far.

Dupree contends that the district court erred in applying this enhancement over its own recognition that "the preponderance of the evidence would [not] support a conclusion that Mr. Dupree was a leader of the robbery in the way that term is ordinarily used in English parlance." The court also commented that its "conclusions regarding the testimony is that they all seemed to be in it together, Dupree, Tufnell and Clopton. And it is difficult to say who really was the leader."

These remarks prefaced the court's enumeration of its factual findings supporting the enhancement, with which Dupree also takes issue. Specifically, Dupree cites Tufnell's own testimony at trial, when, in response to a question about when he first discussed committing a robbery at Value City with Dupree, Tufnell recounted that "[w]hen we first started talking and he said he used to be a Brinks truck driver, I said that it would be a dream to go rob a Brinks truck, armored truck, with all the money and stuff. And the conversation just went on from then." Clopton, when asked to describe how the conversation about robbing Value City first got started, responded that "[i]t actually started with Brian Tufnell." Without specific citation, Dupree also asserts that:

> Pursuant to Tufnell's testimony, it was Tufnell's idea to rob the guard and Tufnell told Clopton who stated that he would have to call Dupree. Then Clopton assumed the