**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Wick HELMANDOLLAR,
Defendant–Appellant.**

No. 87–5175.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1988.

Decided July 29, 1988.

Before TANG, FARRIS and KOZINSKI, Circuit Judges.

TANG, Circuit Judge:

Wick Helmandollar appeals his conviction, pursuant to a conditional plea of guilty, for possession of $3,700,000 in counterfeit government currency in violation of 18 U.S.C. § 472. Helmandollar contends the district court erred in denying his motion to enforce the terms of an alleged plea agreement entered into by himself and agents of the Secret Service. We affirm.

I

On February 20, 1987, a federal grand jury returned a three-count indictment against Helmandollar and his co-defendant Harold Cecil Cooper for conspiracy, transfer and possession of counterfeit currency. At his arraignment on March 2, 1987 Helmandollar entered a plea of not guilty. He subsequently, on March 20, 1987, filed a motion to change his plea to guilty and to enforce the terms of the alleged post-arrest, pre-arraignment plea agreement. Helmandollar's motion asserted that after his arrest, agents of the Secret Service promised him a non-custodial, probationary sentence ("time not counts") in exchange for his cooperation with respect to the extent of the counterfeiting operation.

On April 7, 1987, the district court held a hearing to accept Helmandollar's guilty plea and to determine what, if any plea agreements had been agreed upon. Based on the declarations and exhibits submitted, the district court ruled that Helmandollar had made out "a prima facie case for a plea bargain" and ordered him to call his witnesses. At the evidentiary hearing, the court heard testimony from four witnesses: Assistant United States Attorney John Feiner and three Special Agents of the United States Secret Service: Charles Harrison, Frank O'Donnell, and Albert Joaquin.

The evidence received at the hearing established that Helmandollar and his co-defendant were arrested at approximately 11:00–11:30 a.m. on February 5, 1987 in Industry, California. The defendants were

Stephen B. Sadowsky, Talcott, Lightfoot, Vandevelde, Woehrle & Sadowsky, Los Angeles, Cal., for defendant-appellant.

Thomas A. Hagemann, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

attempting to negotiate the sale of counterfeit currency with undercover agents of the United States Secret Service. Two suitcases containing a total of $3.7 million in counterfeit currency were seized from the defendants' possession. Helmandollar was advised of his *Miranda* rights, and upon the agents' questions concerning the extent of the operation, asserted his right to counsel.

Helmandollar was taken to the offices of the Secret Service in downtown Los Angeles at approximately 12 noon on February 5, 1987. He was not taken before a Magistrate until 3:00 p.m. the next day, approximately 28 hours after his arrest. At the Secret Service offices, Helmandollar was questioned by different agents and combinations of agents until 9:00 p.m. that night.[1] He continued to assert his right to counsel, but none was provided that day.

The information the agents sought from Helmandollar included the identity of the printer of the counterfeit currency, the location of the plates, and the whereabouts of additional counterfeit currency. The record confirms that the agents viewed their interrogation of Helmandollar with a sense of urgency, fearing the printer and equipment might disappear if not immediately located and apprehended. The record also indicates that the agents understood that their continued interrogation of Helmandollar given his assertion of the right to counsel was unlawful. Thus, in the declaration of Agent Harrison:

> Helmandollar continued to assert his rights, but Secret Service considered it to be of primary importance to continue its investigation, i.e., to attempt to identify the scope of the counterfeiting operation and to determine immediately whether any further action needed to be taken, and was willing to give up the admissibility in evidence of any statement obtained from Helmandollar.

Later in the afternoon of February 5, 1987, at approximately 4:00 p.m., Agent Cohen telephoned Assistant United States Attorney (AUSA) John Feiner seeking authorization to negotiate a plea agreement directly with Helmandollar. Based on Cohen's representations,[2] Feiner consulted with his supervisor in the U.S. Attorney's office and authorized Cohen to offer Helmandollar the following "deal": if Helmandollar would (1) identify the printer and assist the agents in locating the plant and any additional counterfeit money; (2) give truthful and complete information; and (3) testify in court or before a grand jury, then Secret Service would make his cooperation known to the United States Attorney's Office, the probation office, and the court and charge him with only one count of counterfeit possession under 18 U.S.C. § 472. Cohen extended this offer to Helmandollar. Helmandollar rejected the offer because he wanted assurances concerning the length of time he could serve in jail and not the number of counts.

At approximately 6:00 p.m. that evening, Agent Albert Joaquin questioned Helmandollar. Joaquin had been informed by Cohen that Helmandollar and Cooper had been "uncooperative and were unwilling to provide information on the manufacture of the counterfeit currency"; Joaquin had also been told Helmandollar was "desirous of an attorney." According to Helmandollar's declaration, Joaquin represented that if he cooperated with the agents, Helmandollar would not have to spend one day in jail. Joaquin, on the other hand, testified that at no time did he make any promises to Helmandollar concerning his sentence or how much time he might spend in prison. After speaking with Joaquin, Helmandollar

---

1. The agents questioning Helmandollar included: Special Agent Charles Harrison; Special Agent Dennis Maez and Special Agent King Davis; Assistant to the Special Agent in Charge at the Los Angeles Field Office (ATSAIC) Michael Cohen; Special Agent Kathleen Moran; and Assistant Special Agent in Charge of the Los Angeles Field Office (ASAIC) Albert Joaquin.

2. AUSA Feiner testified that he specifically asked Agent Cohen whether Helmandollar had been advised of his *Miranda* rights and that "Agent Cohen told me that he had and that [Helmandollar] had waived his rights." [R.T. at 28–29]. Feiner's testimony and declarations also indicate that Cohen advised him that Helmandollar had "just" been arrested. [R.T. at 26–28; C.R. 20 at 45].

agreed to cooperate. From the information provided, the Secret Service recovered an additional $17,000,000 in counterfeit currency.

Based on the evidence presented, the district court ruled that there was no plea bargain, except for a possible agreement that the court would be made aware of Helmandollar's cooperation and for the government's agreement, now moot, to dismiss two of the three counts against Helmandollar. On June 1, 1987 the district court sentenced Helmandollar to a period of two years on count three. Helmandollar timely appeals.

## II

We first consider what standard of review is applicable to the district's determination that there was no plea agreement between Helmandollar and the United States. Helmandollar argues that the existence and terms of the agreement presents a mixed question of fact and law subject to the three-tiered analysis of *United States v. McConney*, 728 F.2d 1195, 1200–03 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The government contends the inquiry is essentially factual and therefore subject to the more deferential, clearly erroneous standard.

■ We disagree with Helmandollar's contention that the existence and terms of the agreement is subject to de novo review. What the parties agreed to in any given case is preeminently a question of fact, to be resolved by the district court. *United States v. Read*, 778 F.2d 1437, 1441 (9th Cir.1985), *cert. denied*, 479 U.S. 835, 107 S. Ct. 131, 93 L.Ed.2d 75 (1986). The inquiry in this case, whether agents of the Secret Service promised Helmandollar probation, turns principally upon an assessment of the credibility of the various witnesses, an issue best resolved by the court in the "superior position" to make such determinations. *See McConney*, 728 F.2d at 1201. Accordingly, we review the district court's findings as to the existence and terms of the alleged plea agreement for clear error. *Read*, 778 F.2d at 1441;

*United States v. Krasn*, 614 F.2d 1229, 1233 (9th Cir.1980). Under this standard, we must affirm the trial court's determinations unless we are left with "the definite and firm conviction that a mistake has been committed." *McConney*, 728 F.2d at 1200.

## III

■ The conduct of the government agents in this case is deeply troubling. The record clearly shows that by their continued interrogation of Helmandollar, despite his repeated requests for an attorney, the agents wilfully and deliberately denied Helmandollar his constitutional right to counsel as articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and subsequent cases. An accused, such as Helmandollar, having expressed his desire to deal with government agents only through counsel, is not subject to further interrogation until counsel has been made available to him. *Edwards v. Arizona*, 451 U.S. 477, 484–5, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). Indeed, to deprive a person of the right to counsel during the period prior to trial has been recognized as potentially more damaging than the denial of counsel during the trial itself. *Maine v. Moulton*, 474 U.S. 159, 169, 106 S.Ct. 477, 483, 88 L.Ed.2d 481 (1985). This is certainly true of the post-arrest period in which a plea agreement is being negotiated. *See* Fed.R.Crim.P. 11(e). In addition, the record also clearly establishes that the agents violated Fed.R. Crim.P. 5(a) in that they failed to take Helmandollar "without unnecessary delay before the nearest available federal magistrate".

■ One of the more disturbing aspects of these violations is that the agents continued with their interrogation, despite *Miranda* and Rule 5, fully aware of the sanction of exclusion yet willing to incur it, ostensibly in the name of a greater good. This "ends justify the means" approach is wholly contrary to the duty of a United States prosecutor and analagously to agents of the United States Government to act with the utmost probity and upright-

ness. In the classic statement on the subject by Justice Sutherland:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The same considerations apply to law enforcement officers.

■ The traditional remedy for such violations, the exclusion or suppression of statements or evidence unlawfully obtained, has no application in this case because the record is clear that no such improper use was made by the government. Helmandollar's indictment and subsequent plea of guilty was based exclusively on the ample pre-arrest evidence against him. As an alternate remedy, Helmandollar proposes the following: where the conduct of government agents was responsible for creating the isolated circumstances under which plea negotiations took place, the burden of proving the existence or nonexistence of the plea agreement and its terms

should be borne by the government and not the defendant. Although we agree that the government's conduct in this case is troubling, we decline to adopt this special burden shifting remedy solely to respond to the unusual circumstances of this case.[3]

Helmandollar's analogy to cases involving *Miranda* violations is inapposite. The government bears "a heavy burden [ ] to demonstrate that the accused knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel," *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, usually only where an illegally obtained confession or other evidence is sought to be used against the accused. Here, the issue is not whether Helmandollar "waived" his rights; it is clear that he did not. Nor, as we have indicated, was there any impermissible use of Helmandollar's incriminating post-arrest statements at any stage of the proceedings against him. Thus, we resolve the question of what party had the burden of persuading the fact-finder of the existence of the plea agreement with reference to the ordinary rules governing the allocation of the burden of proof. Helmandollar, as the moving party, would have the burden of pleading and persuading the trier of fact of the existence of the plea bargain agreement.[4] *See generally,* LeFave & Israel, 1 *Criminal Procedure,* § 10.3 (1984); *McCormick on Evidence,* § 337 (2d Ed. 1972).

■ We recognize that in light of *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) it is clear that a plea must be "voluntary and knowing" and "if it was induced by promises, the essence of those promises must in some way be made known." 404 U.S. at 261–62, 92 S.Ct.

**3.** We note that a variety of sanctions exist to address acts of prosecutorial misconduct, including: appellate reversal; contempt citations; reprimand in a published opinion that specifically identifies the offending prosecutor or government agents by name; removal from office; discipline by the legal profession; and civil actions for damages. *See generally,* B. Gershman, *Prosecutorial Misconduct* § 13 (1987).

**4.** *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), *cert. denied,* 451 U.S. 1018, 101 S.Ct.

3008, 69 L.Ed.2d 390 (1981) is not to the contrary. There, the Tenth Circuit held that constitutional principles of fairness require that once the government acknowledges the existence of an agreement, the government has the burden of establishing a breach by the defendant if the agreement is to be considered enforceable. Here, of course there was no acknowledgment of the existence of the agreement. Thus we do not reach the precise question raised in *Calabrese*.

at 498. Here, a claim was made that a promise had been made and the district court, following an evidentiary hearing, sought to ascertain the essence of those promises and decided the point adversely to the appellant. The determination that there was no plea bargain agreement on the issue of probation was not clearly erroneous.

AFFIRMED.