PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1874
_____

UNITED STATES OF AMERICA

v.

DWAYNE THOMPSON,
a/k/a White Chocolate;
a/k/a "D"

Dwayne Thompson,
Appellant

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-07-cr-00303-001)
District Judge: Honorable Joy Flowers Conti
_____

Argued June 25, 2014
_____

Before: McKEE, *Chief Judge*, FUENTES and
GREENAWAY, JR., *Circuit Judges*.

1

(Opinion Filed: November 19, 2014)

_____

Michael L. Ivory, Esq. [ARGUED]
Rebecca R. Haywood, Esq.
David J. Hickton, Esq.
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
        *Counsel for Appellee*


Sarah S. Gannett, Esq. [ARGUED]
Brett G. Sweitzer, Esq.
Leigh M. Skipper, Esq.
Federal Community Defender Office
For the Eastern District of Pennsylvania
Suite 540 West – Curtis Center
601 Walnut Street
Philadelphia, PA 19106
        *Counsel for Appellant Dwayne Thompson*

_____

OPINION

_____


GREENAWAY, JR., *Circuit Judge*.

Dwayne Thompson ("Appellant" or "Thompson") appeals the District Court's judgment entered on March 18, 2013. Thompson argues that the District Court erred in

failing to suppress (a) the fruits of a search which, he contends, law enforcement lacked reasonable suspicion to conduct, and (b) statements he made while in custody, prior to being presented to a magistrate judge. Thompson claims that such statements violated the *McNabb-Mallory* rule. For the reasons set forth below, we will affirm the District Court's denial of Appellant's motion to suppress the fruits of the search, but we will reverse the District Court's suppression ruling regarding Thompson's statements. Accordingly, we will vacate and remand Thompson's judgment of conviction.

## I.  FACTUAL AND PROCEDURAL HISTORY

From 2001 until July 2007, Dwayne Thompson was the supplier for a cocaine distribution network known as the "Cali Connect." The Cali Connect shipped cocaine to the East Coast where it was distributed, including in and around the Pittsburgh area. Thompson transported cocaine from California to Pittsburgh either in one of his own vehicles or in rentals cars. After completing his deliveries, Thompson would wait for the money before returning to California, or receive payment on his next trip to the area.

Investigators became aware of Thompson through their cooperating witnesses and a wiretap investigation. Several cooperating witnesses named Thompson as the source for the Cali Connect's cocaine. In wiretapped phone conversations with other targets, Thompson made comments that investigators interpreted to be drug-related.

3

## A. The Traffic Stop

On June 29, 2007, Thompson was involved in a traffic stop near Amarillo, Texas. Trooper Livermore of the Texas Department of Public Safety was "running traffic" on I-40 near Amarillo, Texas, along with his partner, Chad Grange. Within the law enforcement community, I-40 is a "known corridor for narcotics, weapons, and money." (App. 508.) Shortly before 1:40 p.m., Livermore saw a maroon pickup truck, with a hard-top cover on the bed, traveling eastbound at a speed of 84 mph in a 70 mph zone. It is illegal under Texas law to travel in excess of a posted speed limit. Livermore stopped the truck and approached the passenger's side window. Thompson was the sole occupant of the pickup truck.

Livermore spoke with Thompson and advised him of the reason for the stop. Livermore asked Thompson where he was going. Thompson replied that he was en route to Indianapolis and that he would be staying there for approximately three weeks. Livermore observed that Thompson only had one suitcase for such a long trip, and it raised his suspicions. Livermore said, "I didn't think it was the norm to have that size luggage for the length of the trip." (App. 516.)

Livermore also claimed that Thompson appeared nervous: he did not make eye contact, his voice was shaky, and a vein in the side of his neck was pulsing. Thompson's signs of nervousness, in conjunction with the small suitcase, the fact that I-40 is a known drug corridor, and knowledge that California is a "source" state, aroused Livermore's suspicions that this trip was a drug-trafficking trip.

4

Livermore went back to the patrol car and ran Thompson's criminal history. The criminal history check showed several dated narcotics offenses, and a more recent prior conviction for a firearm offense. When Livermore asked Thompson – still in the car – about his criminal history, Thompson disclosed only the firearm conviction.

Livermore began to write up the citation for the speeding ticket and asked Thompson if he could search the vehicle. Thompson said that he could not. At this point, Livermore consulted with Sergeant Grange, and they decided to call for a K-9 detection team.

The K-9 unit was contacted at 1:50 p.m., eleven minutes after the initial stop. The officers were notified at 1:52 p.m. that the K-9 unit was en route. It took the K-9 unit approximately thirty minutes to arrive at the scene. Prior to the K-9 search, Thompson agreed to accept responsibility for anything that might be discovered in the truck.

When the K-9 unit arrived at the scene, the dog alerted after his first pass by scratching at the back of the pickup truck. The officers then searched the vehicle and opened the locked truck-bed using a key provided by Thompson. When they opened it, they immediately smelled marijuana. Beneath a tarp lay five large, plastic tubs containing marijuana.

Thompson was arrested and transported to the Texas Highway Patrol's district office. Officers spoke with investigators regarding the Cali Connect, who informed them that they should check the back tailgate area, as that is where Thompson had been observed to keep narcotics. The troopers searched the area and found six kilograms of cocaine. Thompson was charged locally for the marijuana found in the

vehicle. He posted bond, was released, and was not informed about the discovery of cocaine.

## B. Failure to Timely Present

A few weeks later, a Drug Enforcement Administration ("DEA") task force executed a series of search warrants on residences believed to be associated with Cali Connect members, including Thompson, in Pennsylvania, Indiana, and California. The task force members executed a search warrant on Thompson's home at 7:00 a.m., on July 17, 2007.

Thompson was found in an upstairs bedroom, on the phone. He was taken outside to a patrol car briefly, then returned inside where DEA Agent Strobel read Thompson his *Miranda* rights. No separate, written *Miranda* waiver was signed at that time, or later. Thompson sat at a table in handcuffs, surrounded by uniformed officers, while the search was conducted. During the search, the officers played wiretap recordings of Thompson and others involved in Cali Connect, obtained while investigating the group. Thompson remained there until the search concluded at 9:40 a.m. Investigators recovered two kilograms of cocaine from the search.

At the conclusion of the search, agents drove Thompson to the DEA field office in Los Angeles ("L.A.") for processing. Due to the distance, traffic, and a pit-stop for fast food, the drive took approximately an hour and a half. Officers did not question Thompson during the ride, but did "lay[] the case out for him." (App. 677.) Agent Strobel also informed Thompson about the value of cooperation.

6

They arrived at the DEA office shortly after 11:00 a.m., when Thompson was processed and placed in a holding room. Processing takes approximately twenty minutes, and it is DEA policy to process prisoners before taking them to court for their initial appearances. In the early afternoon, Agent Strobel asked Thompson "what he wanted to do[.]" (App. 680). Thompson informed the officer that he wanted to cooperate. At that time, more than six hours had passed since his arrest at approximately 7:00 a.m.

At this point, Agent Strobel and another DEA Agent, Christopher Balchon, began interviewing Thompson. Over the course of the afternoon, Thompson offered information about his cocaine sources in the L.A. area and about his co-conspirators. In addition, they had Thompson place a series of phone calls in an effort to solicit a "reverse buy-bust" on one of the alleged co-conspirators.

Agent Balchon did not present Thompson with a written waiver of his right to prompt presentment until 6:38 p.m., nearly twelve hours after his arrest. Thompson was advised at this point about his right to a speedy appearance, and re-advised of his right to remain silent and his right to counsel. Thompson signed the form. Thompson then requested that the interview cease, and he was taken to Metropolitan Correctional Center to spend the night.

Thompson continued to cooperate the next day, but it became clear that Thompson would be unable to arrange the "buy-bust," and the effort was abandoned. The agents returned him to Metropolitan Correctional Center and delivered him for presentment the next morning. Thompson was presented nearly 48 hours after his initial arrest.

### C. Procedural Posture

Following the denial of several motions to suppress, Thompson pled guilty to one count of conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h).  As part of the plea, Thompson preserved the right to appeal several adverse suppression rulings, including those at issue in this appeal: (1) the denial of the motion to suppress evidence seized in the Texas traffic stop; and (2) the denial of the motion to suppress statements obtained following the execution of search warrants at his home and various other locations.

Thompson was sentenced to a term of imprisonment for 292 months and five years of supervised release on the drug conspiracy count; a term of imprisonment for 240 months and three years of supervised release on the money laundering count, to run concurrently; and a $200 special assessment.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's judgment of conviction.  "We review a district court's order denying a motion to suppress under a mixed standard of review.  We review findings of fact for clear error, but we exercise plenary review over legal determinations." *United States v. Lewis*, 672 F.3d 232, 236-37 (3d Cir. 2012)

## III. ANALYSIS

## A. Reasonable, Articulable Suspicion to Extend the Traffic Stop

Thompson first contends that the troopers who were involved in the traffic stop lacked articulable suspicion that would justify the extension of their traffic stop to include a K-9 search.

"After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). An inchoate hunch does not satisfy the standard of reasonable suspicion; rather, the Fourth Amendment requires that law enforcement have "some minimal level of objective justification for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)) (internal quotation marks omitted); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). This level of suspicion is "less than proof of wrongdoing by a preponderance of the evidence [and] . . . less demanding than that for probable cause." *Sokolow*, 490 U.S. at 7 (internal citations omitted).

"In determining whether there was a basis for reasonable suspicion, a court must consider the totality of the circumstances, in light of the officer's experience." *Givan*, 320 F.3d at 458; *see also United States v. Arvizu*, 534 U.S.

266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.") (citing *Cortez*, 449 U.S. at 417-18).

The Supreme Court has stressed that the totality of the circumstances standard enables "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417-18) (internal quotation marks omitted). Further, while "the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they must serve to eliminate a substantial portion of innocent travelers." *United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009) (quoting *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995) (internal quotation marks omitted). Thus, courts are not permitted to analyze factors individually, as innocent factors taken together may appear suspicious to an experienced officer. *Terry v. Ohio*, 392 U.S. 1, 22-23 (1968).

The parties agree that Trooper Livermore's initial justification for the stop was lawful because Thompson was driving 84 miles per hour in a 70 miles per hour zone.[1] "A

---

[1] "A speed in excess of the limits established by Subsection (b) . . . is prima facie evidence that the speed is not reasonable and prudent and that the speed is unlawful." Tex. Transportation Code Ann. § 545.352 (West 2011).

police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Thus, the only question before us is whether Livermore had reasonable articulable suspicion to extend the stop to include a K-9 search.

At the time of the stop, Livermore had been involved in approximately 1500 traffic stops both as a state trooper and as a member of a local police department. Ten of the stops involved felonious amounts of contraband and thirty misdemeanor arrests, all along the corridor Thompson was stopped on. Livermore was trained to recognize indicators of drug smuggling and other criminal activities at the training academy and on the job.

Livermore testified that Thompson's explanation about the length of his trip and the amount of luggage was suspicious. Livermore noted that the amount of luggage appeared to be inconsistent with the stated length of the trip. Livermore also observed Thompson's behavior and physical characteristics as additional indicators of suspicious activity. Thompson was visibly nervous, with a shaky voice and a vein on his neck pulsating rapidly. His answers to questions came out hesitatingly, and he neglected to mention his prior involvement with controlled substances or narcotics when questioned by Livermore.

Based upon Livermore's testimony and experience, the District Court concluded that he possessed a "reasonable articulable suspicion in terms of articulating his basis for those suspicions." (App. 618.) The Court determined that, based on the "totality of the circumstances, viewing the

11

officer's experience and training, that the investigatory stop was appropriate and under the Fourth Amendment was more than an inchoate hunch." (*Id.* at 619.)

Thompson, in arguing that the District Court erred in finding that Livermore had reasonable articulable suspicion, relies upon the Supreme Court's decision in *Reid v. Georgia*, 448 U.S. 438 (1980). In *Reid*, a DEA agent observed Reid looking back in the direction of a second man, who possessed a matching shoulder bag. The agent stated that when he approached them, both men appeared to be nervous. The Court found that the evidence relied on in this case would "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid*, 448 U.S. at 441. The Supreme Court further held that the agent's suspicion that "[Reid] and his companion were attempting to conceal the fact that they were traveling together . . . was more an inchoate and unparticularized suspicion or hunch, than a fair inference in the light of his experience, [and was] simply too slender a reed to support the seizure in this case." *Id.* (internal quotation marks and citations omitted).

Unlike in *Reid*, Thompson's behavior, when examined in totality, serves to "eliminate a substantial portion of innocent travelers." *Mathurin*, 561 F.3d at 174 (quoting *Karnes*, 62 F.3d at 493) (internal quotation marks omitted). During Livermore's stop of Thompson, there were many factors that piqued the officer's suspicion, not simply nervousness and glances. Accordingly, it was reasonable for Livermore to infer, based upon his experience as a state trooper and as a member of the local police, that Thompson was engaged in illegal activity.

12

In reviewing the totality of the circumstances, we agree with the District Court that Livermore had a "reasonable, articulable suspicion" to believe that Thompson was engaged in an illegal activity, and to extend Thompson's traffic stop to include a K-9 search. We will affirm the District Court's denial of Thompson's motion to suppress relating to the traffic stop on June 29, 2007.

## B. The *McNabb-Mallory* Rule

Thompson next argues that certain statements he made on July 17, 2007 – specifically, his confession – should be suppressed on the basis that his interrogation violated his right to prompt presentment.

The Federal Rules of Criminal Procedure require that a defendant who has been arrested within the United States be brought "without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a)(1)(A). In a series of cases, the Supreme Court gave teeth to this rule by requiring the exclusion of any confessions obtained during an unreasonable period of detention that violated the prompt presentment requirement. *See McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957); *see also Corley v. United States*, 556 U.S. 303, 322 (2009) (confirming that even voluntary confessions should be suppressed if they occurred during a period of unreasonable delay). The right to speedy presentment not only checks the likelihood of coercive questioning, but also avoids "all the evil implications of secret interrogation of persons accused of crime." *Corley*, 556 U.S. at 307 (quoting *McNabb*, 318 U.S. at 344). Presentment is the "point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against

him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing; giving the defendant a chance to consult with counsel; and deciding between detention or release." *Corley*, 556 U.S. at 320.

Following the Supreme Court's articulation of the *McNabb-Mallory* exclusionary rule, Congress enacted 18 U.S.C. § 3501 in order to create a safe harbor period for certain voluntary confessions. *See Corley*, 556 U.S. at 309-10 (discussing legislative history and intent of § 3501). With respect to Rule 5(a)'s requirement of speedy presentment, § 3501(c) provides that "a confession . . . shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession was made or given by such person within six hours immediately following his arrest or other detention." 18 U.S.C. § 3501(c). The section further provides that its six-hour cut-off "shall not apply in any case in which the delay in bringing such person before such magistrate judge . . . is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge." *Id.*

The reasonableness standard under the *McNabb-Mallory* rule focuses primarily on whether the delay was for the purpose of interrogation. *See Corley*, 556 U.S. at 308 ("[D]elay for the purpose of interrogation is the epitome of unnecessary delay.") (quoting *Mallory*, 354 U.S. at 455-56) (internal quotation marks omitted). Simply put, a delay in presentment of a defendant before a magistrate judge is unreasonable and unnecessary when it is "of a nature to give opportunity for the extraction of a confession." *Mallory*, 354 U.S. at 455.

14

In order to determine whether a *McNabb-Mallory* violation occurred, we must first determine whether voluntary statements were received either within six hours of a defendant's detention, or within a longer period deemed reasonable in light of travel or transportation difficulties. If they were, the statements occurred within the safe-harbor period, and no exclusion is required. *Corley*, 556 U.S. at 322 ("If the confession came within that period, it is admissible . . . .").

Next, where a voluntary confession falls beyond the safe-harbor period, § 3501(c) then requires a court to determine whether the delay was nevertheless reasonable or necessary under the *McNabb-Mallory* rule. *See id.* ("If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed."); *United States v. McDowell*, 687 F.3d 904, 909 (7th Cir. 2012) ("A confession given *outside* the six-hour period is also admissible under § 3501(c) if the court finds the confession was voluntary *and* the delay in presentment was reasonable.") (emphasis in original).

A delay may be reasonable if caused by administrative concerns, such as the unavailability of a magistrate following an arrest, *see, e.g., United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009), or by a shortage of personnel, *id.*; *United States v. Boche-Perez*, 755 F.3d 327, 336-38 (5th Cir. 2014). In addition, de minimis delays past the six-hour limitation may not necessarily raise procedural concerns. *See United States v. Jacques*, 744 F.3d 804, 814-15 (1st Cir. 2014) (one minute outside the six-hour limit found to be a minor and ultimately harmless miscalculation of time).

15

A delay "is unreasonable and unnecessary when it is 'of a nature to give opportunity for the extraction of a confession.'" *Garcia-Hernandez*, 569 F.3d at 1106 (quoting *Mallory*, 354 U.S. at 455). A delay caused by law enforcement's "desire to investigate other crimes is not a legitimate excuse for their failure to respect . . . [the] right to a prompt arraignment." *United States v. Perez*, 733 F.2d 1026, 1035-36 (2d Cir. 1984); *see also id.* (government failed to provide any evidence for why delay was necessary, when a magistrate judge was available nearby after the defendant had been processed and there were six agents assigned to the case). Additionally, a delay is unreasonable where the record clearly shows that agents "continued with their interrogation, despite *Miranda* and Rule 5, fully aware of the sanction of exclusion yet willing to incur it, ostensibly in the name of a greater good." *United States v. Helmandollar*, 852 F.2d 498, 501 (9th Cir. 1988); *see also id.* (defendant held for more than 28 hours before presentment and questioned by multiple agents continuously, despite seeking to assert right to counsel on numerous occasions). Moreover, unexplained delays, despite being in close proximity to an available judge, can be considered unreasonable. *United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir. 1988) (no reasonable excuse for no arraignment because the arraignments were held within the same building where Wilson was held).

Here, it is undisputed that Thompson's confession came considerably after the six-hour period had run. As a result, the question before us is whether the delay in his presentment was unreasonable or unnecessary under the *McNabb-Mallory* cases.

Thompson contends that, because his waiver was untimely under § 3501(c), his subsequent confession is

inadmissible under *McNabb-Mallory*. Specifically, Thompson insists that the delay cannot be deemed "reasonable" because it was unnecessary, as Thompson was arrested in relative proximity to the federal courthouse and before the business day had commenced. Agents had the opportunity to bring him before the court for at least one and possibly two arraignment dockets or seek a waiver of presentment, but simply chose not to do so, in order to pursue his cooperation. (Appellant's Br. 37).

On the other hand, the government contends that the delay in Thompson's presentment was reasonable because the delay was not for the purpose of interrogation. In addition to the delays caused by: (1) the search of Thompson's residence; (2) the time spent in transporting Thompson to the DEA office and providing him with food; (3) processing Thompson at the DEA office; and (4) the missed opportunity to bring Thompson to the morning docket the day of his arrest, the government asks this Court to find that pursuit of cooperation is a reasonable delay. The government contends that pursuit of cooperation is particularly distinguishable from pursuit of confession in this case because "Thompson's confession was superfluous to [the] issue of his guilt." (Appellee's Br. 38).

We find that the government's arguments do not hold water. Thompson signed a waiver of his right to prompt presentment approximately 12 hours after his arrest. He was ultimately presented 48 hours after his arrest. The traditional exceptions to the *McNabb-Mallory* rule focus on the practical obstacles to getting to a magistrate. *See, e.g., Garcia-Hernandez*, 569 F.3d at 1106 (administrative delays are reasonable and necessary). Certainly, some of the obstacles to the delay were logistical. "[L]aw enforcement personnel are permitted, within reasonable limits, to investigate whether

the crime occurred; search and secure a premises; and secure, confiscate, or destroy contraband before taking an arrestee to a magistrate." *Boche-Perez*, 755 F.3d at 337.

Here, two and a half hours were spent searching and securing the premises, as well as confiscating contraband before Thompson was taken to a magistrate. Thus, this part of the delay is reasonable. In addition, law enforcement testified that part of the delay was due to transportation. The rule itself makes clear that transportation-based delays are reasonable. 18 U.S.C. §3501(c). The government also claims that by the time Thompson arrived to the DEA offices, the morning arraignment docket was unavailable to them. Accepting this as true, this delay would be considered reasonable as well. A magistrate can be considered unavailable due to a host of reasons, including a full docket. *See Boche-Perez*, 755 F.3d at 338.

However, while some of the obstacles to the delay were reasonable, as the government notes, "[t]he overwhelming bulk of the delay in this case was devoted to giving Thompson the opportunity to cooperate and was therefore reasonable." (Appellee's Br. 42.) We are unwilling to hold that "pursuit of cooperation" may constitute a basis for delay in presentment. Drawing a line between pursuit of cooperation and the extraction of a confession is untenable without looking at the subjective intent of the officers. It is almost inevitable that the pursuit of cooperation will lead to a confession by way of interrogation. "Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all." *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). As a supervising court, it is nearly impossible to separate the pursuit of cooperation from the most unreasonable excuse: interrogation.

18

Thus, we must hold that pursuit of cooperation is not a reasonable excuse for delay in presentment. Were we to hold otherwise, the resulting imprecision would lead to confusion on where to draw the line between engagement based on a mutual desire to cooperate, versus law enforcement's desire to interrogate, with the hope that cooperation may result. Additionally, we would be required to make a credibility determination regarding whether law enforcement was legitimately representing that their pursuit of cooperation was done in earnest. Such an outcome would undermine *Corley*'s affirmation of the *McNabb-Mallory* rule, by making the inquiry turn on the subjective intent of the officers rather than the objectively verifiable and logistical causes of delay permissible under 18 U.S.C. § 3501(c). *See Corley*, 556 U.S. at 322 ("We hold that § 3501 modified *McNabb-Mallory* without supplanting it.").

In addition to not finding pursuit of cooperation as a reasonable excuse to delay, the logistical components of Thompson's delay account for only a portion of the time before he agreed to cooperate fifteen to thirty minutes after the six-hour time period elapsed, or before he was presented with a waiver at 12 hours, or presented to a magistrate judge nearly 48 hours after being arrested. The government presented no evidence as to the unavailability of the afternoon docket, nor why Thompson had to be processed at the DEA prior to presentment. Further, the government did not explain why Thompson was not presented with a waiver within the six hour constraint, which would have permitted the government to pursue Thompson's cooperation. Our opinion does not impede law enforcement's legitimate desire and effort to seek out cooperation.

The purpose of the *McNabb-Mallory* rule is not merely to "avoid all the evil implications of secret interrogation of persons accused of crime." *McNabb*, 318 U.S. at 344. Rather, the rule was also designed to ensure that a defendant is brought "before a judicial officer as quickly as possible so that he may be advised of his rights." *Mallory*, 354 U.S. at 454. The government was required to present Thompson to a magistrate as quickly as possible. Instead, the government delayed Thompson's arraignment so that they could continue to persuade him to cooperate. The longer a defendant goes without being apprised of his rights, the more vulnerable he is. "In a world without *McNabb-Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to . . . [C]ustodial police interrogation, by its very nature, isolates and pressures the individual, . . . and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed . . . ." *Corley*, 556 U.S. at 320-21 (internal quotation marks and citations omitted). Because we are unpersuaded by the government's argument that the delay in presentment was reasonable, we will reverse the District Court's denial of Thompson's motion to suppress his statements.

## VI. CONCLUSION

We will affirm the District Court's ruling denying the motion to suppress the evidence found as a result of the traffic stop on June 29, 2007. We will reverse the District Court's ruling denying the motion to suppress the statements made in violation of the *McNabb-Mallory* rule and Fed. R. Crim. P. 5(a)(1)(A) from July 17, 2007. In this case, the delay of presentment was not reasonable, and accordingly,

20

Thompson's statements should have been suppressed. We therefore vacate the judgment of conviction and remand the case to the District Court for proceedings consistent with this opinion.